# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 14-50392

United States Court of Appeals
Fifth Circuit

**FILED**
January 8, 2016

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

ARTURO GALLEGOS CASTRELLON, also known as Benny, also known as Farmero, also known as 51, also known as Guero, also known as Pecas, also known as Tury, also known as 86, also known as "Tury", also known as "Guero", also known as "Farmero", also known as "Benny", also known as "Pecas", also known as "51",

Defendant-Appellant.

Appeal from the United States District Court
for the Western District of Texas
USDC No. 3:10-CR-2213

Before DAVIS, BARKSDALE, and DENNIS, Circuit Judges.

PER CURIAM:*

A jury convicted Arturo Gallegos Castrellon ("Gallegos") of several federal crimes, but he appeals only the conviction for 18 U.S.C. § 956—conspiracy to commit murder in a foreign country. He argues that the evidence was insufficient to establish two essential elements of the offense: no

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 14-50392

conspirator performed an overt act in the United States, and no conspirator was in the United States at the time he conspired. We find that the evidence is sufficient and AFFIRM the conviction.

I.

On March 31, 2010, Gallegos ordered a hit team to assassinate the occupants of two vehicles transporting children after a birthday party. The hit team complied with his order and riddled the two vehicles with bullets. Two people died in one car, and another person died in the second car. The children were the only survivors.

Gallegos served as a lieutenant in the paramilitary group Barrio Azteca ("Azteca") in Juarez, Mexico. His main role was to organize hit teams for Azteca in its ongoing war with a rival cartel. He received much of his information on potential targets from the Azteca headquarters in El Paso, Texas.

Because Azteca had branches in both El Paso and Juarez, they focused on sharing information and believed that "without communication, the gang cannot exist." To ensure reliable communication between the United States and Mexico, Azteca required its members to be familiar with their activities in each place. This prevented the gang from being "caught off-guard for any" reason.

Azteca also relied on a system of hierarchy and punishment to run its gang efficiently. The hierarchy of Azteca ranged from prospect to soldier to lieutenant to captain. If a soldier failed to follow the order of a lieutenant or captain, he could "end up killed."

Gallegos ordered Chino Valles ("Valles") who was in charge of communication between Juarez and El Paso to ask the Aztecas in El Paso to research the Texas license plate on a white Honda Pilot. Gallegos had noticed the vehicle outside his home in Juarez several times and believed that it

No. 14-50392

belonged to a rival cartel. Moreover, he thought that the El Paso Aztecas could determine its owner through its Texas plate.

Gallegos also instructed his hit teams to "look-out" for the vehicle. They found two similar vehicles at a birthday party attended by employees of the United States Consulate. Even though they did not match perfectly, the two vehicles leaving the children's party were targeted on Gallegos' order. The assassins killed two individuals in one car and one person in the other.

Mexican authorities arrested Gallegos and transferred him to the United States. The United States prosecuted and convicted Gallegos on eleven counts of various crimes, including one count of conspiracy to commit murder. The district court sentenced Gallegos to four consecutive terms of life imprisonment.[1] Gallegos challenges only his conviction for conspiracy to commit murder outside the United States.

## II.

We review de novo the district court's denial of a motion for judgment as a matter of law based on a preserved challenge to the sufficiency of the evidence.[2] If the defendant fails to preserve his challenge by renewing it at the close of evidence, however, we review for plain error.[3] Here, although Gallegos moved for a judgment as a matter of law after the government's case, he failed to renew the objection at the close of the evidence. Accordingly, we review the district court's denial of his motion for plain error.

---

[1] Gallegos received seven terms of life imprisonment served concurrently, and three terms of life imprisonment served consecutive to all other sentences.

[2] *United States v. McDowell*, 498 F.3d 308, 312 (5th Cir. 2007).

[3] *United States v. Davis*, 690 F.3d 330, 336 & n.6 (5th Cir. 2012) ("[W]here a defendant moves for a judgment of acquittal at the end of the Government's case but, after presenting evidence, fails to renew that motion, the defendant has forfeited his insufficiency challenge and our review is for [plain error].") (citing *United States v. Delgado*, 672 F.3d 320, 331 n.9 (5th Cir. 2012) (en banc) (explaining that "[a]lthough the plain-error test should always be cited, we recognize that the 'manifest miscarriage of justice' formulation is itself a reasonable restatement of the four-prong test."))).

No. 14-50392

To show plain error, the government must ordinarily satisfy a four-prong test: (1) there must be an error or defect, (2) the legal error must be clear or obvious, (3) the error affected defendant's substantial rights, and (4) the error seriously affects the fairness, integrity or public reputation of the judicial proceedings.[4] When we review a denial of a motion for judgment as a matter of law, based on an unpreserved sufficiency challenge, an error is considered obvious under the second prong only where "the record is devoid of evidence pointing to guilt."[5] To prevail on appeal, therefore, Gallegos must show that the evidence is more than insufficient; he must show that the record is devoid of evidence pointing to guilt.[6]

## III.

Conspiracy to commit murder in a foreign country requires proof of four elements: the defendant and at least one other person agreed to commit a murder outside the United States; the defendant willfully joined the agreement with the intent to further its unlawful purpose; at least one conspirator committed an overt act in furtherance of the conspiracy in the United States; and, at least one conspirator was in the United States at the time he conspired.[7] Gallegos challenges the sufficiency of the government's proof on the latter two elements—essentially, he argues that the record is devoid of evidence establishing that the El Paso Aztecas were coconspirators in the murder.

"The Government is not required to prove the existence of the conspiracy and the agreement between the co-conspirators and the defendant by direct evidence, but may present circumstantial evidence, such as the co-conspirator's

[4] *Delgado*, 672 F.3d at 329 (citing *United States v. Olano*, 507 U.S. 725, 732-36 (1993)).
[5] *See Delgado*, 672 F.3d at 331 (emphasis omitted).
[6] *See id.*
[7] *See United States v. Martinez-Herrera*, 539 F. App'x 598, 600 (5th Cir. 2013) (citing *United States v. Wharton*, 320 F.3d 526, 537-38 (5th Cir. 2003)).

concerted actions, from which the jury can infer that a conspiracy existed."[8] The record here contains such circumstantial evidence. Gallegos' hit team leader—Jesus Ernesto Chaves Castillo ("Castillo")—testified that he heard Gallegos order Valles to call the El Paso Aztecas and find out to whom the white vehicle was registered.

We can reasonably infer that Valles telephoned El Paso based on his role in the Aztecas.[9] Because Valles conducted the communication between Juarez and El Paso, a telephone call to El Paso would be routine for him, and there is no reason to assume that he would not follow Gallegos' direct order. Moreover, the chance that Valles contacted El Paso is heightened considering how important the Aztecas considered communication.

Second, we can reasonably infer that the El Paso Aztecas received this call and understood the request. The notion that an El Paso Azteca would not take some action on an order by a lieutenant such as Gallegos is extremely unlikely—they could face punishment including death for failing to follow such an order. Moreover, this exchange between Valles and the Aztecas in El Paso constitutes an overt act in the United States.[10] Finally, given the open communication between Juarez and El Paso—and the fact that Azteca members were required to be familiar with the organization's activities in both locations—it is likely that the Aztecas in El Paso understood why Valles requested the investigation. There is no reason why Valles would not have discussed that surveillance by a rival cartel was the reason to check the vehicle.

---

[8] *United States v. Gallo*, 927 F.2d 815, 820 (5th Cir. 1991) (discussing drug conspiracy).

[9] *See United States v. Virgen-Moreno*, 265 F.3d 276, 284-85 (5th Cir. 2001) (explaining that in the context of 21 U.S.C. § 841 "[d]irect evidence of a conspiracy is unnecessary; each element may be inferred from circumstantial evidence. . .[and the government] only needs to produce slight evidence to connect an individual to the conspiracy.").

[10] *United States v. Cardona-Ramirez*, 358 F. App'x 562, 564 (5th Cir. 2009) ("[T]here is a sufficient factual basis to establish that a portion of the conspiracy, the overt act of receiving the telephone call, took place in the United States.").

No. 14-50392

Also, according to Castillo, calls to the El Paso branch about hits were not unusual. Because the vehicle allegedly belonged to a rival cartel and Valles often discussed hits with the Azteca representative in El Paso, they likely understood that Gallegos planned to take violent action against its owner and implicitly agreed to further this unlawful purpose.[11]

As the record contains evidence tending to show that Valles made the call to El Paso and that the El Paso Aztecas received the call, understood its import, and agreed to further its objective, the record is not devoid of evidence establishing that the El Paso Aztecas were coconspirators in the murder. The phone call from Valles to El Paso thus satisfies both the third element—that at least one conspirator committed an overt act in furtherance of the conspiracy in the United States—and the fourth element—that at least one conspirator was in the United States at the time he conspired—required to establish conspiracy to commit murder in a foreign country.[12]

IV.

For these reasons, we agree with the government that the record is not devoid of evidence on any of the elements of this offense, and AFFIRM the conviction.

---

[11] *See United States v. Montgomery*, 210 F.3d 446, 449 (5th Cir. 2000) (noting that in the context of 21 U.S.C. § 846, the government must prove that an agreement existed, but "[t]he agreement may be implicit, and the jury may infer its existence from circumstantial evidence.").

[12] *See Martinez-Herrera*, 539 F. App'x at 600.