# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**
April 30, 2020

Lyle W. Cayce
Clerk

No. 17-51077

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

JORGE EDUARDO NAVA,

Defendant - Appellant

Appeal from the United States District Court
for the Western District of Texas

Before OWEN, Chief Judge, and HIGGINBOTHAM and WILLETT, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Appellant Jorge Eduardo Nava challenges the two concurrent 480-month sentences he received after a jury convicted him of drug-trafficking offenses. Nava contends that the district court erred in holding him accountable for an uncharged methamphetamine seizure, both because the seizure did not qualify as relevant conduct under the Sentencing Guidelines and because the district court applied an inappropriate standard of proof in making its relevant-conduct determination. Nava also challenges the offense-level adjustment he received for abusing a position of trust. Finding no reversible error, we affirm.

No. 17-51077

## I.

The Drug Enforcement Administration ("DEA") began investigating Nava on August 15, 2016, when a police officer in Gulfport, Mississippi, stopped a Ford F-150 pickup truck for a traffic violation. A records check revealed that the vehicle was registered to Nava, who had purchased it only a few days earlier. Nava was not with the truck, which was being driven by a person identified in the record as Co-Conspirator 1 ("CC-1"). Upon questioning, CC-1 stated that Nava had registered the vehicle in his own name because CC-1 did not have a valid driver's license. A search of the vehicle revealed 29 kilograms of pure liquid methamphetamine concealed within the gas tank. CC-1 told officers he had picked up the truck in Ciudad Juarez, Mexico, and had been instructed to drive to Atlanta, where he was to contact a man known as "Guacho" for further instructions.[1] CC-1 did not indicate whether Nava played any role in the meth operation beyond purchasing and registering the truck.

A few weeks later, on September 9, agents detained Nava at a border crossing and interviewed him about the methamphetamine seizure. Nava denied any involvement with the Gulfport load, but he volunteered to assist the DEA by providing information about cocaine trafficking. Nava claimed that members of drug-trafficking organizations ("DTOs") frequented a bar he owned in Ciudad Juarez, where he overhead them discussing their operations. In addition, Nava said he was familiar with "a lot of illegal activity" because his father had been involved in a DTO in Mexico.

Nava met with agents again that evening at his apartment in El Paso, Texas, where he signed a confidential source agreement promising to provide information in exchange for money. Over the ensuing days, Nava explained

---

[1] The record does not indicate CC-1's gender. Male pronouns are used here for simplicity.

No. 17-51077

how the Cartel de Jalisco Nueva Generacion DTO moved cocaine from Peru through several stops in Mexico and across the U.S. border into El Paso. Eventually, Nava admitted that he was personally involved with the DTO, serving as a coordinator for cocaine distribution. He told agents about two upcoming cocaine transactions involving a trafficker named Ernesto Lara. Agents observed and documented the first transaction, which occurred as Nava had described on September 12, 2016.

The trouble began with the second transaction, which occurred the following day. First, Nava called Lara and directed him to pick up five bundles of cocaine from Nava's apartment and deliver them to Denver, Colorado. Nava then contacted agents and told them that Lara was headed to Denver with a load of cocaine, but he misled them about the route Lara was taking. Nevertheless, Border Patrol agents stopped Lara's vehicle at an immigration checkpoint in Desert Haven, Texas, and discovered 5.22 kilograms of cocaine in the passenger seat. While Lara was detained, officers permitted him to answer a phone call from Nava. Lara told Nava he had successfully made it through the checkpoint, and Nava instructed Lara to call him when he reached Carlsbad, New Mexico, where Nava had promised to wire him money for a hotel room. Nava then called agents and once again provided false information about Lara's route, in an apparent effort to maintain the benefits of his informant contract without imperiling his drug business.

During a post-arrest interview, Lara admitted to being involved with Nava in additional cocaine transactions. For example, Lara reported that during a weeklong trip to Arkansas the previous month, he had observed Nava exchanging large quantities of cocaine for bundles of cash. Lara had been paid $1,000 for driving Nava to Arkansas. Additional investigation revealed that Nava had shared several videos on Facebook Messenger that showed him with packages of cocaine, large amounts of money, and firearms.

No. 17-51077

Nava was arrested on September 20, 2016 and charged with possessing and conspiring to possess with intent to distribute cocaine.[2] He proceeded to trial, where a jury convicted him of both offenses. At sentencing, Nava was held accountable for 18.72 kilograms of cocaine as well as the 29 kilograms of methamphetamine seized in Gulfport. Among other enhancements, Nava received a two-level upward adjustment for abusing a position of trust by misleading agents about Lara's route to Colorado.[3] The district court sentenced Nava to two concurrent terms of 480 months' imprisonment, to be followed by five years of supervised release.

On appeal, Nava raises three challenges to his sentence. First, he contends that the district court erred by attributing the Gulfport methamphetamine seizure to him as relevant conduct. Second, he argues that the district court violated his due process rights by making its relevant-conduct determination under a preponderance standard rather than beyond a reasonable doubt. Finally, Nava challenges the abuse-of-trust adjustment he received for misleading the DEA.

## II.

### A.

In a drug-trafficking case, the defendant's base offense level is determined by the amount of drugs involved in the crime.[4] In addition to drugs actually seized in the investigation, the district court may attribute to the defendant additional, unadjudicated quantities of drugs that constitute

---

[2] *See* 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(ii), 846; 18 U.S.C. § 2. Lara was charged as Nava's co-defendant but only Nava proceeded to trial.

[3] *See* U.S.S.G. § 3B1.3. Nava also received offense-level enhancements for maintaining a drug premises and for soliciting an undercover agent to murder Lara to prevent him from testifying at trial. The district court granted Nava's objection to the weapons enhancement contemplated by the presentence investigation report ("PSR"), but Nava received additional upward adjustments for his leadership role in the DTO and for obstruction of justice.

[4] *United States v. Rhine*, 583 F.3d 878, 885 (5th Cir. 2009).

"relevant conduct" as defined by the Sentencing Guidelines.[5] Relevant conduct includes "all acts and omissions . . . that were part of the same course of conduct or common scheme or plan as the offense of conviction."[6]

"Particularly in drug cases, this circuit has broadly defined what constitutes 'the same course of conduct' or 'common scheme or plan.'"[7] An unadjudicated offense is considered part of a common scheme or plan "if it is substantially connected to the offense of conviction by at least one common factor, such as common victims, common accomplices, common purpose, or similar modus operandi."[8] Offenses qualify as part of the same course of conduct "if they are sufficiently connected or related to the offense of conviction as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses."[9]

The district court's determination of what constitutes relevant conduct is a factual finding, which we review for clear error.[10] A finding is not clearly erroneous so long as it is "plausible in light of the record as a whole."[11] We will find clear error "only if a review of all the evidence leaves us with the definite and firm conviction that a mistake has been committed."[12]

**B.**

Nava contends that the district court erred in finding that the methamphetamine seized in Gulfport was relevant conduct to his cocaine-trafficking convictions because "[t]he only evidence linking these offenses was

---

[5] *Id.*

[6] U.S.S.G. § 1B1.3(a)(2).

[7] *Rhine*, 583 F.3d at 885 (quoting *United States v. Bryant*, 991 F.2d 171, 177 (5th Cir. 1993)).

[8] *United States v. Ortiz*, 613 F.3d 550, 557 (5th Cir. 2010) (internal alterations and quotation marks omitted) (quoting *Rhine*, 583 F.3d at 885).

[9] *Id.* at 558 (internal alterations omitted) (quoting U.S.S.G. § 1B1.3 cmt. 5(B)(i)).

[10] *United States v. Alford*, 142 F.3d 825, 831 (5th Cir. 1998).

[11] *Rhine*, 583 F.3d at 885.

[12] *United States v. Barfield*, 941 F.3d 757, 761–62 (5th Cir. 2019) (internal quotation marks omitted) (quoting *United States v. Rodriguez*, 630 F.3d 377, 380 (5th Cir. 2011)).

that the truck with the methamphetamine was registered in Nava's name." He points out that the offenses involved different controlled substances and that there is no evidence they were carried out by the same DTO or the same accomplices.

However, Nava's view of the facts is incomplete. The record reveals several additional commonalities between the cocaine and methamphetamine operations. First, all of the drug offenses occurred within a few weeks of one another: from mid-August to mid-September of 2016. Second, Nava purchased the truck just a few days before the Gulfport seizure. Third, Nava was recorded in an undated Facebook call discussing plans to "burn" a truck—that is, to drive it through a port of entry several times to make it "look[] like a daily driver" so "it doesn't look suspicious if it's loaded" with drugs. Finally, in April of 2017, Nava was recorded telling a friend in a jailhouse phone call: "They got me with two persons, one in Mississippi and . . . Ernesto [Lara]."[13]

We agree with Nava that the Gulfport methamphetamine seizure does not qualify as part of a common scheme or plan with his cocaine-trafficking activities. Given how little we know about the meth operation, there is scant evidence that the offenses share "common victims, common accomplices, common purpose, or similar modus operandi."[14] However, it was not clear error to attribute the meth to Nava as part of the "same course of conduct" with his charged offenses.

---

[13] The parties dispute the correct translation of Nava's jailhouse phone call, which was conducted in Spanish. The Government urges the version contained in the PSR, which describes Nava as saying that "two of *his* people were busted." Obviously, this translation is more favorable to the Government because it directly implicates Nava as the organizer of both the Gulfport meth load and the charged cocaine operations. The translation introduced at trial—that "they got me with two persons"—is somewhat more ambiguous. Because this latter version was relied upon by the jury during trial and the district court at sentencing, we use it here.

[14] *Rhine*, 583 F.3d at 885. Certainly, the offenses share the common motive of making money, but "the general goal of selling drugs for a profit is insufficient to satisfy the common purpose factor." *Ortiz*, 613 F.3d at 557.

No. 17-51077

Factors to consider in the course-of-conduct analysis "include the degree of similarity" and "the regularity of the offenses," as well as "the time interval between the offenses."[15] "A weak showing as to any one of these factors will not preclude a finding of relevant conduct; rather, 'when one of the above factors is absent, a stronger presence of at least one of the other factors is required.'"[16] Here, although we do not know the details of the meth operation, we do know that both the cocaine and meth loads were picked up in Ciudad Juarez, concealed in vehicles connected to Nava, and transported across the border into the United States. CC-1's statement that Nava registered the Gulfport truck in his own name because CC-1 lacked a license, together with the jailhouse recording in which Nava admitted that authorities had connected him with activity in Mississippi, suggest that he played a supervisory role in both operations. In addition, the meth and cocaine seizures occurred in close temporal proximity.

No single one of these facts is dispositive, and the district court could reasonably have come out the other way. As Nava points out, a short timeline does not automatically qualify an offense as relevant conduct.[17] In addition, the similarities between the cocaine and meth offenses, while notable, are not overwhelming. Most obviously, they involved different controlled substances, a fact that "suggests distinct crimes."[18] In addition, the Facebook recording discussing "burning" a truck is of little probative value, not only because it is undated but also because there is no evidence that the Gulfport truck was actually driven back and forth across the border.

---

[15] *United States v. Ocana*, 204 F.3d 585, 590 (5th Cir. 2000) (internal quotation marks omitted) (quoting U.S.S.G. § 1B1.3 cmt. 5(B)(ii)).

[16] *Rhine*, 583 F.3d at 886 (internal alterations omitted) (quoting U.S.S.G. § 1B1.3 cmt. 5(B)(ii)).

[17] *See United States v. Heard*, 891 F.3d 574, 576 (5th Cir. 2018); *United States v. Chavira*, 530 F. App'x 330, 334 (5th Cir. 2013) (unpublished) (per curiam).

[18] *Heard*, 891 F.3d at 576.

No. 17-51077

Still, the district court's decision is "plausible in light of the record as a whole."[19] This case is readily distinguishable from the principal case on which Nava relies, *United States v. Ortiz*, where we held that cocaine found in the same apartment as the charged marijuana could not be attributed to the defendant as relevant conduct.[20] There, the only connection between the drugs was that they "were in the same place at the same time."[21] Moreover, the cocaine was concealed in a suitcase that belonged to a third party, not the defendant.[22] This case is also unlike *United States v. Rhine*, where we concluded that the defendant could not be held accountable for uncharged drug activity that occurred at least 17 months before the offense of conviction and there was no evidence whatsoever that he "engaged in any intervening criminal activity."[23]

Here, though there is an absence of evidence supporting regularity,[24] there is robust temporal proximity and evidence of similarity across the offenses. Critically, Nava's truck registration and jailhouse admissions, together with the similar geographical pattern and close temporal proximity of the transactions, convince us that Nava's role across the transactions was similarly supervisory. Pairing these "distinctive similarities" with the strong temporal proximity, it was not clear error to attribute the methamphetamine seizure to Nava as relevant conduct.[25]

---

[19] *Rhine*, 583 F.3d at 885.

[20] 613 F.3d 550.

[21] *Id.* at 558.

[22] *Id.*

[23] *Rhine*, 583 F.3d at 887.

[24] *See Ortiz*, 613 F.3d at 558 (quoting *Rhine*, 583 F.3d at 890) ("Deciding the 'regularity' of the offense is a search for a 'pattern of similar unlawful conduct directly linking the purported relevant conduct and the offense of conviction.'").

[25] *United States v. Wall*, 180 F.3d 641, 646 (5th Cir. 1999) (quoting *United States v. Maxwell*, 34 F.3d 1006, 1011 (11th Cir. 1994)).

No. 17-51077

## III.

## A.

Nava next argues that the district court violated the Fifth Amendment by applying a preponderance-of-the-evidence standard in its determination that Nava was responsible for the methamphetamine offense in Gulfport. Because this relevant conduct increased his Guidelines sentencing range, he argues, the district court should have been required to make its finding beyond a reasonable doubt. We review *de novo* a constitutional challenge to a district court's application of the Sentencing Guidelines.[26]

## B.

As Nava concedes, controlling precedent forecloses his constitutional challenge. According to the Supreme Court's settled understanding of the Fifth Amendment, the preponderance standard generally satisfies due process during sentencing even where the court is deciding whether to enhance a sentence based on the defendant's commission of an uncharged crime.[27] As we have noted, "it is well-settled . . . that a district court may increase a defendant's sentence under the Sentencing Guidelines based on facts found by the court by a preponderance of the evidence, provided that the resulting sentence does not exceed the statutory maximum."[28] Because Nava's 480-month sentence falls within the statutory maximum term, the district court's factfinding by a preponderance of the evidence did not run afoul of the Fifth Amendment.[29]

---

[26] *United States v. Shakbazyan*, 841 F.3d 286, 289 (5th Cir. 2016).

[27] *United States v. Watts*, 519 U.S. 148, 156 (1997).

[28] *United States v. Hicks*, 389 F.3d 514, 530 (5th Cir. 2004); *see United States v. Hebert*, 813 F.3d 551, 564 (5th Cir. 2015) (noting that Fifth Amendment challenges to the preponderance standard at sentencing "are foreclosed by our precedent . . . because we have held that courts can engage in judicial factfinding where the defendant's sentence ultimately falls within the statutory maximum term").

[29] *See* 21 U.S.C. § 841(b)(1)(A)–(B); *United States v. Lewis*, 476 F.3d 369, 391 (5th Cir. 2007).

## IV.

### A.

Finally, Nava challenges the upward adjustment he received for abusing a position of trust. Section 3B1.3 of the Sentencing Guidelines provides for a two-offense-level increase where "the defendant abused a position of public or private trust . . . in a manner that significantly facilitated the commission or concealment of the offense."[30] A "sentencing court must conduct a two-step inquiry when considering whether to apply the § 3B1.3 enhancement," first determining whether the defendant occupied a position of trust at all before "proceed[ing] to ascertain the extent to which the defendant used that position to facilitate or conceal the offense."[31]

Because Nava did not object to the adjustment in the district court, we review for plain error only.[32] Under the four-prong framework of plain-error review, Nava must demonstrate (1) an error that (2) is "clear or obvious" and that (3) "affected [his] substantial rights."[33] If the first three prongs are satisfied, we may exercise our discretion to correct the error only if it (4) "seriously affects the fairness, integrity or public reputation of judicial proceedings."[34]

### B.

The district court found that Nava abused his position of trust as a government informant by misleading the DEA about Lara's route to Denver. Nava contends that the court erred at the first step of the § 3B1.3 inquiry because he did not occupy a position of public or private trust. We need not

---

[30] U.S.S.G. §3B1.3.

[31] *United States v. Ollison*, 555 F.3d 152, 165 (5th Cir. 2009).

[32] *United States v. Williams*, 847 F.3d 251, 254 (5th Cir. 2017) (explaining that where an objection is "admittedly unpreserved, we review for plain error").

[33] *Puckett v. United States*, 556 U.S. 129, 135 (2009).

[34] *Id.* (internal alterations omitted) (quoting *United States v. Olano*, 507 U.S. 725, 736 (1993)).

No. 17-51077

consider the merits of Nava's argument. As Nava concedes, even if the district court committed plain error in imposing the adjustment, he cannot satisfy the third prong of plain-error review, which requires the defendant to prove that the error "affected [his] substantial rights" by "show[ing] a reasonable probability that, but for the district court's misapplication of the Guidelines, he would have received a lesser sentence."[35] Here, the position-of-trust adjustment raised Nava's total offense level from 46 to 48, which was then reduced by default to 43, the highest offense level available under the Guidelines.[36] Because a two-level reduction from 48 to 46 would still result in a total offense level of 43, Nava cannot prove that any error affected his substantial rights.[37]

## V.

For the foregoing reasons, the two concurrent 480-month sentences imposed by the district court are affirmed.

---

[35] *United States v. John*, 597 F.3d 263, 285 (5th Cir. 2010) (internal alterations omitted) (quoting *United States v. Price*, 516 F.3d 285, 289 (5th Cir. 2008)); *see Molina-Martinez v. United States*, 136 S. Ct. 1338, 1346 (2016).

[36] *See* U.S.S.G. Ch. 5, Pt. A, cmt. 2 (providing that in the "rare case[]" where a defendant's total offense level exceeds 43, it "is to be treated as an offense level of 43").

[37] Nava admits that his abuse-of-trust challenge could succeed only if we reversed the district court on the relevant-conduct issue as well. Together, the relevant-conduct methamphetamine and the abuse-of-trust adjustment contributed eight points to Nava's total offense level, meaning that without them, he would score at 40 instead of 48. This reduction would affect his substantial rights as a score of 40 would yield a lower Guidelines range.