# United States Court of Appeals for the Fifth Circuit

---

No. 22-50951

---

United States Court of Appeals
Fifth Circuit

**FILED**
January 3, 2024

Lyle W. Cayce
Clerk

United States of America,

*Plaintiff—Appellee*,

*versus*

Jose Guadalupe Diaz Diaz,

*Defendant—Appellant*,

consolidated with

---

No. 22-50956

---

United States of America,

*Plaintiff—Appellee*,

*versus*

Martin Perez Marrufo,

*Defendant—Appellant*.

---

Appeal from the United States District Court
for the Western District of Texas
USDC Nos. 3:10-CR-2213-8,

3:10-CR-2213-9

_____

Before CLEMENT, ENGELHARDT, and OLDHAM, *Circuit Judges*.

KURT D. ENGELHARDT, *Circuit Judge*:

This appeal arises out of the convictions of two Barrio Azteca sicarios, Jose Guadalupe Diaz-Diaz ("Diaz") and Martin Perez-Marrufo ("Perez-Marrufo"),[1] for their involvement in the murders of three people in Ciudad Juarez, Mexico in 2011. While Diaz and Perez-Marrufo separately appealed parts of their convictions and sentences, a key issue for both appellants is whether sufficient evidence existed to support their 18 U.S.C. § 956(a)(1) convictions for conspiracy to commit murder in a foreign country. The appeals were consolidated to jointly address this issue. In addition to the conspiracy conviction, Diaz challenges his aiding-and-abetting convictions and his three consecutive life sentences for his convictions under 18 U.S.C. § 924(c) and (j). Perez-Marrufo also challenges an obstruction of justice enhancement imposed at sentencing. For the following reasons, we AFFIRM IN PART and VACATE AND REMAND IN PART.

## I. Factual and Procedural Background

Diaz and Perez-Marrufo were two of the total thirty-five defendants charged in the Western District of Texas in 2011 for the Consulate Murders, so called because one of the victims, Leslie Ann Enriquez Catton ("Enriquez"), was a U.S. Consulate employee. The other two victims were Enriquez's husband, Arthur Redelfs ("Redelfs"), and Jorge Alberto Salcido Ciniceros ("Salcido"), husband to another U.S. Consulate employee, Hilda Antillon. The third superseding indictment contained twelve counts, including charges under 18 U.S.C. § 956(a)(1) for conspiracy to kill persons

_____

[1] Note that the parties refer to each defendant using different variations of their names. Many of the gang members are also referred to by various nicknames: Diaz is known as "Zorro" and Perez-Marrufo is known as "Popeye."

in a foreign country and under 18 U.S.C. § 924(c) and (j) for murder resulting from the use of a firearm in relation to crimes of violence and drug trafficking. At the end of an eleven-day trial, the jury convicted Diaz and Perez-Marrufo on all counts.

To fully understand the defendants' convictions, it is helpful to have a better understanding of Barrio Azteca, the paramilitary gang to which both defendants belong. Barrio Azteca was formed in 1986 by Texas prisoners "to unite inmates that were native to the El Paso, Texas, and West Texas area." Although still headquartered in the Coffield Unit (a Texas prison), the gang is highly active in Juarez, Mexico, and operates on both sides of the border. The cross-border relationship is important to the gang's operations, as the gang members are required to "see each other as brothers" and "help each other" in prison. To aid this relationship, Barrio Azteca relies heavily on a vast communication system, involving letters, telephone calls, and prison visits. To Barrio Azteca, "communication is essential" and "nothing will be accomplished without communication." To that end, the gang often uses coded language and complex combinations of various languages and dialects in an attempt to mask their illegal activities.

Diaz and Perez-Marrufo are known as Azteca "sicarios" or hitmen, who lead hit teams for the gang. Barrio Azteca has a rigid hierarchy with set leadership ranks including the Capo Mayor, lieutenants, sergeants, and soldiers. Under this hierarchy, Chino Valles ("Valles") served a crucial role: he was the chief liaison between gang members in Juarez and those in the United States at the time of the Consulate Murders. As the lieutenant handling most cross-border communications, Valles worked closely with members in El Paso, and when members were released from prison in the United States, they reported to Valles in Mexico to receive work assignments.

Barrio Azteca operates under a set of "sacred rules" that members must follow or else face severe consequences. If a gang member refuses to carry out an order from a superior, for example, he will face disciplinary action, which may include death. To both enforce the rules within the gang and to carry out the gang's illegal activities, Barrio Azteca uses extreme acts of violence, including killing rival drug dealers and gang members. From 2008 to 2010 specifically, Barrio Azteca allied with the Juarez Cartel in its war against the Sinaloa Cartel for drug market territory, a period characterized by extreme violence and many deaths.

With this context, we now turn to the facts at issue here. At the time of the Consulate Murders, Arturo "Benny" Gallegos Castrellon was, as a Barrio Azteca lieutenant, one of the gang's top leaders in Juarez. In March of 2010, Benny grew concerned that a white Honda Pilot with Texas plates was surveilling his house. Via radio, Benny asked Valles, as the lieutenant in charge of cross-border communication, to check out the Honda Pilot and find the address where it was registered.

On March 13, 2010, a U.S. Consulate employee held a birthday party for her child in Juarez. Enriquez, Redelfs, and Salcido all attended this party. At the same time, Benny learned that a white Honda Pilot was located near the party hall. Diaz and Perez-Marrufo separately responded to Benny's radio calls ordering Azteca members to head to the Honda Pilot's location. When the hit teams arrived, however, they noticed both a white Honda Pilot with Mexico plates and a white Toyota RAV4 with Texas plates, parked near each other. Benny ordered both cars to be followed as they left the party; Diaz followed the Toyota, and Perez-Marrufo followed the Honda Pilot. Benny, again via radio, ordered the hitmen to kill the occupants of both cars. Diaz fired on the occupants of the Toyota, killing Enriquez and Redelfs. Perez-Marrufo fired on the occupants of the Honda Pilot, killing Salcido and wounding the three children in the backseat. Later, Benny learned that the

gang mistook the identities of both cars' passengers—none of the victims were involved in the ongoing drug war, nor were they conducting surveillance on Benny's house.

During Diaz and Perez-Marrufo's trial, the jury heard the testimony of various Barrio Azteca members, including: (1) Jesus "Camello" Chavez Castillo, the boss of the Azteca hit teams who testified that Benny asked his men to check out the Honda Pilot; (2) Alberto "Fresa" Payan (also referred to as "Nunez"), a sicario who participated in many murders with the defendants and heard the radio communications on March 13, 2010; and (3) Miguel "Lentes" Nevarez, another Azteca member who followed the Toyota on Benny's orders and was present when Diaz killed the occupants.

After the Government concluded its case, Diaz and Perez-Marrufo moved for a judgment of acquittal. For the conspiracy to commit murder in a foreign country charge (Count 5), Perez-Marrufo argued that the Government failed to prove that an overt act occurred in the United States and that a conspirator was present in the United States at the time of the agreement. Diaz joined this argument and also challenged the sufficiency of the evidence on certain drug-trafficking and money-laundering charges (Counts 2, 3, and 4). Diaz did not explicitly challenge the sufficiency of the evidence for the aiding-and-abetting charges (Counts 8 and 11). The district court denied both defendants' motions.

After the jury verdict finding them guilty on all counts, Diaz and Perez-Marrufo were sentenced to concurrent life sentences for Counts 1, 2, 3, 5, 9, 10, and 11, to run concurrently with a 240-month sentence on Count 4. The court also imposed three additional life sentences for Counts 6, 7, and 8, to run consecutively to all other counts. Diaz and Perez-Marrufo both timely appealed, and their appeals were later consolidated.

**II. Analysis**

This appeal involves four issues, which we address in turn: (a) whether the Government produced sufficient evidence to support Diaz and Perez-Marrufo's convictions for conspiracy to commit murder in a foreign country; (b) whether the district court abused its discretion in imposing an obstruction of justice sentencing enhancement in Perez-Marrufo's case; (c) whether the Government produced sufficient evidence to support Diaz's convictions for aiding and abetting in Salcido's murder; and (d) whether the district court plainly erred in imposing mandatory consecutive life sentences for Diaz's three section 924(j) convictions.

### a. Conspiracy to commit murder in a foreign country

The issue central to both defendants' appeals is whether the evidence adduced at trial was sufficient to support the convictions for conspiracy to commit murder in a foreign country. To obtain a conviction for a conspiracy under 18 U.S.C. § 956(a)(1), the Government must prove four elements: "(1) the defendant agreed with at least one person to commit murder; (2) the defendant willfully joined the agreement with the intent to further its purpose; (3) during the existence of the conspiracy, one of the conspirators committed at least one overt act in furtherance of the object of the conspiracy; and (4) at least one of the conspirators was within the jurisdiction of the United States when the agreement was made." *United States v. Wharton*, 320 F.3d 526, 538 (5th Cir. 2003); *see also United States v. Castrellon*, 636 F. App'x 204, 206 (5th Cir. 2016) (specifying that the overt act in element (3) must occur in the United States); 18 U.S.C.A. § 956 (imposing punishment where a conspirator "commits an act within the jurisdiction of the United States to effect any object of the conspiracy"). Here, both Diaz and Perez-Marrufo challenge the sufficiency of the evidence on elements (3) and (4).

This Court reviews preserved challenges to the sufficiency of the evidence *de novo*, "with a heavy thumb on the scale in favor of the verdict." *United States v. Cabello*, 33 F.4th 281, 288 (5th Cir. 2022). Our review is "highly deferential" to the jury's finding of guilt. *United States v. Zamora-Salazar*, 860 F.3d 826, 831 (5th Cir. 2017). As such, the Court will uphold the jury's verdict so long as "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Vargas-Ocampo*, 747 F.3d 299, 303 (5th Cir. 2014). The Court views "all evidence and all reasonable inferences drawn from it in the light most favorable to the government." *United States v. Mergerson*, 4 F.3d 337, 341 (5th Cir. 1993). "[C]ircumstances altogether inconclusive, if separately considered, may, by their number and joint operation, especially when corroborated by moral coincidences, be sufficient to constitute conclusive proof." *United States v. Rodriguez-Mireles*, 896 F.2d 890, 892 (5th Cir. 1990) (citation omitted). Of course, "the jury is free to choose among reasonable constructions of the evidence." *United States v. Pennington*, 20 F.3d 593, 597 (5th Cir. 1994).

Viewing the evidence in the light most favorable to the verdict, the Government produced sufficient evidence to support the defendants' convictions. To establish element (3) of the charge, the Government relied on evidence that Benny ordered Valles to work with his men in El Paso, Texas, the location of Azteca headquarters, to investigate the registration of a Honda Pilot with Texas plates. *See* Transcript of Record at 381–82, 394. Receiving this phone call in the United States served as the Government's evidence of an overt act committed in furtherance of the conspiracy under element (3). *See United States v. Cardona–Ramirez*, 358 F. App'x 562, 564 (5th Cir. 2009) ("[T]here is a sufficient factual basis to establish that a portion of the conspiracy, the overt act of receiving the telephone call, took place in the United States."); *accord United States v. Caldwell*, 16 F.3d 623,

624 (5th Cir. 1994) (holding that telephone calls were made in furtherance of conspiracy); *United States v. Naranjo*, 14 F.3d 145, 147 (2d Cir. 1994) ("Phone calls can constitute overt acts in furtherance of a conspiracy.").

As for element (4), the Government concedes that it did not name or otherwise explicitly identify a person in the United States who served as a co-conspirator; however, the Government argues on appeal and argued to the jury that "the Azteca's operations, structure, and Benny's and Valles' responsibilities within that structure" support an inference that an El Paso gang member followed the chain of command to carry out the task of investigating the Honda Pilot. *See United States v. Portillo*, 969 F.3d 144, 165 (5th Cir. 2020) (affirming conviction based on "substantial circumstantial evidence" of defendant's "role in the organization"). In sum, we agree that "[e]xtensive evidence regarding the operation of the Barrio Aztecas, coupled with evidence that Benny ordered that his men involve the El Paso Aztecas in the investigation of the Honda Pilot, was sufficient for a reasonable juror to conclude that an Azteca both conspired, and committed an overt act, within the jurisdiction of the United States."

While it is clear that the Government relies on purely circumstantial evidence to satisfy elements (3) and (4), circumstantial evidence consistently suffices to support a conspiracy conviction. *See United States v. Gallo*, 927 F.2d 815, 820 (5th Cir. 1991) ("The Government is not required to prove the existence of the conspiracy and the agreement between the co-conspirators and the defendant by direct evidence, but may present circumstantial evidence, such as the co-conspirator's concerted actions, from which the jury can infer that a conspiracy existed."). Here, based on the "collocation of circumstances," a reasonable jury could have found that an Azteca soldier working under Benny and Valles would obey the order to search for the Honda Pilot with Texas plates. *See United States v. Malatesta*, 590 F.2d 1379,

1381 (5th Cir. 1979). In fact, it is inconceivable that an Azteca soldier would <u>not</u> follow such an order. *See* Transcript of Record at 394.

Notably, this Court considered the same issue, under essentially the same set of facts, in *United States v. Castrellon*, in which Benny appealed his own conviction for conspiracy to commit murder in a foreign country. While not controlling precedent,[2] the Court's analysis of Benny's sufficiency of the evidence argument is helpful here. In *Castrellon*, the Court found that circumstantial evidence existed from which the jury could conclude that elements (3) and (4) of the conspiracy charge were met. 636 F. App'x at 206. The Court highlighted that Camello, who also testified in Diaz and Perez-Marrufo's trial, "testified that he heard [Benny] order Valles to call the El Paso Aztecas and find out to whom the white vehicle was registered." *Id.* Naturally, the Court held, "[b]ecause Valles conducted the communication between Juarez and El Paso, a telephone call to El Paso would be routine for him, and there is no reason to assume that he would not follow [Benny's] direct order." *Id.* at 206–07. The Court also emphasized the structure and modus operandi of Barrio Azteca as important circumstantial evidence: first, "the chance that Valles contacted El Paso is heightened considering how important the Aztecas considered communication"; and second, "[t]he notion that an El Paso Azteca would not take some action on an order by a lieutenant such as [Benny] is extremely unlikely—they could face punishment including death for failing to follow such an order." *Id.* at 207. Because the facts in *Castrellon* mirror the facts in the present case, this Court reaches the same outcome: the Government's circumstantial evidence suffices to establish elements (3) and (4) of the charge. *See United States v.*

_____

[2] *Castrellon* is an unpublished, per curiam opinion. Additionally, the standard of review was for plain error (rather than *de novo*) because Benny failed "to preserve his challenge by renewing it at the close of the evidence." *Castrellon*, 636 F. App'x at 205.

*Montgomery*, 210 F.3d 446, 459 (5th Cir. 2000) ("The agreement may be implicit, and the jury may infer its existence from circumstantial evidence.").

Diaz argues that, even if someone in the United States received the call to trace the license plates, there is no evidence showing that that person was a conspirator to murder specifically. Helpfully, the Court in *Castrellon* addressed this same argument and held that "given the open communication between Juarez and El Paso—and the fact that Azteca members were required to be familiar with the organization's activities in both locations—it is likely that the Aztecas in El Paso understood why Valles requested the investigation." *Castrellon*, 636 F. App'x at 207. "Because the vehicle allegedly belonged to a rival cartel and Valles often discussed hits with the Azteca representative in El Paso, they likely understood that [Benny] planned to take violent action against its owner and implicitly agreed to further this unlawful purpose." *Id.* Because the facts are extremely similar, if not identical, for Diaz and Perez-Marrufo on this point, and because this Court's reasoning in *Castrellon* was sound, we again reach the same conclusion here: the circumstantial evidence in the record supports a finding that an Azteca soldier in the United States followed the order to trace the license plates in furtherance of the conspiracy to commit murder in Mexico.

Diaz responds that the evidence produced at Benny's trial was materially different from that presented at his own, and that the Government cannot rely on testimony elicited during a co-conspirator's trial to support the conviction. Perez-Marrufo makes a similar argument, focusing specifically on the differences in the testimony that Camello gave regarding Benny's order to be on the lookout for the Honda Pilot. However, the differences appellants point out, even if true, are not decisive here. For example, although Camello's testimony may have been less explicit at the appellants' trial, he did testify that Benny instructed Valles to check on the white Honda Pilot with Texas plates, as part of Valles' job to conduct cross-

border communication. *See* Transcript of Record at 340–44, 381–82. Further, Camello testified that calls between El Paso and Juarez regularly concerned "anything from drugs that might be needed somewhere to . . . having to kill someone." Transcript of Record at 271. Drawing all reasonable inferences in favor of the verdict, evidence that Benny ordered Valles to initiate an investigation of the Honda Pilot, combined with all of the evidence regarding Azteca operations, suffices to support the conspiracy conviction. Because a rational trier of fact could conclude that the Government met its burden on elements (3) and (4), we affirm the defendants' convictions for conspiracy to commit murder in a foreign country.

b. Sentencing enhancement for obstruction of justice

Perez-Marrufo argues that the district court improperly applied the section 3C1.1 sentencing enhancement for obstructing or impeding the administration of justice based on the destruction of the vehicle Perez-Marrufo used in the Consulate Murders. This Court reviews "a district court's interpretation of the Sentencing Guidelines de novo and its factual determinations for clear error." *United States v. Garza*, 587 F.3d 304, 308 (5th Cir. 2009). "A factual finding is clearly erroneous only if, based on the entirety of the evidence, the reviewing court is left with the definite and firm conviction that a mistake has been made." *United States v. Brooks*, 681 F.3d 678, 712 (5th Cir. 2012).

Section 3C1.1 of the U.S. Sentencing Guidelines states:

> If (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction

> and any relevant conduct; or (B) a closely related offense,
> increase the offense level by 2 levels.

U.S.S.G. § 3C1.1. Evidence at trial showed that Perez-Marrufo returned the Ford Explorer used during the Consulate Murders to Camello, and Benny ordered Camello to "make it disappear." Camello testified that he had another Azteca member burn the car, before he and the rest of the hit teams laid low to avoid detection in the days following the murders. Thus, there is no question—and Perez-Marrufo concedes—that the vehicle was burned to conceal evidence implicating Barrio Azteca in the crimes.

Despite this concession, Perez-Marrufo argues that the enhancement is inapplicable because there was no evidence to establish that the vehicles were destroyed "during the course of an investigation." He cites to this Court's decision in *United States v. Wilson*, 904 F.2d 234 (5th Cir. 1990), for the proposition that the obstruction of justice must occur during the investigation or prosecution of the offense. However, Perez-Marrufo's reliance on *Wilson* is misplaced. In *Wilson*, the Court explicitly noted that the defendant "was unaware that any investigation was taking place" and that the defendant's "intent clearly was not to impede the investigation or prosecution of his offense." 904 F.2d at 235. The opposite is true here. Perez-Marrufo, along with Camello and Benny, clearly intended to conceal evidence so as to "impede the investigation" of the murders. And importantly, the investigation into the Consulate Murders began immediately, likely before the car was even burned. According to witnesses, law enforcement arrived on the scene right away, and the FBI began its investigation less than three hours after the murders. The district court therefore reasonably applied the sentencing enhancement where the investigation was likely already under way and Perez-Marrufo intended to prevent law enforcement from finding the car.

Further, as the Government points out in its brief, a 2006 amendment to section 3C1.1 allows a court to consider "pre-investigation conduct . . . if misconduct occurs with the defendant's correct belief that a governmental investigation is probably underway or will probably be underway." *United States v. Stubblefield*, 942 F.3d 666, 669 (5th Cir. 2019). As a result, the enhancement applies "to a defendant who (1) believed that there was or would be a governmental investigation and (2) acted to obstruct or impede that investigation." *Id.* Here, the sentencing enhancement applies because Perez-Marrufo (1) clearly believed there would be an investigation and (2) acted to destroy the car as potential evidence in that investigation. Thus, the district court's application of the section 3C1.1 guideline was "plausible in light of the record as a whole." *United States v. Adam*, 296 F.3d 327, 334 (5th Cir. 2002).

Regardless, any possible error in applying the enhancement here was ultimately harmless because the adjustment made no difference to Perez-Marrufo's sentence. As the Government succinctly stated: The enhancement "raised [the] adjusted offense level in each grouping from 46 to 48, and raised the combined adjusted offense level from 51 to 53. But the total offense level was reduced by default to 43, the highest offense level available under the guidelines . . . Because a two-level reduction would still result in a total offense level of 43, any error did not affect [Perez-Marrufo's] substantial rights." Br. for Resp't at 36; *see also United States v. Nava*, 957 F.3d 581, 589 (5th Cir. 2020) (holding that defendant could not prove any error affected his substantial rights where two-level reduction would still result in total offense level of 43). Accordingly, we affirm the district court's imposition of the sentencing enhancement.

c. Aiding and abetting Salcido's murder

Diaz challenges his convictions on Counts 8 and 11 for aiding and abetting Salcido's murder because, he argues, Perez-Marrufo murdered Salcido and Diaz himself was not present during that murder. Diaz argues the evidence was insufficient to support the jury's verdict on both counts.

First, the standard of review. The Government argues that where a defendant asserts specific grounds in a Rule 29 acquittal motion, he waives all other grounds. *See United States v. Herrera*, 313 F.3d 882, 884 (5th Cir. 2002). In response, Diaz asserts that he "made particularized arguments about the sufficiency of the evidence on some of the charged counts, but the district court clearly understood him to have moved for judgment of acquittal . . . as to all counts." However, the district court's ruling— including the statement that it "believes there is sufficient evidence to go to the jury regarding the remaining counts of Two through Eleven"—does not support Diaz's position. The court's general finding that sufficient evidence existed to take the whole case to a jury does not excuse Diaz's failure to object with specificity on each grounds for acquittal that he now challenges on appeal. Because Diaz did not properly preserve his arguments on Counts 8 and 11, they are forfeited, and we review the newly raised claim for a manifest miscarriage of justice. *United States v. Green*, 293 F.3d 886, 895 (5th Cir. 2002). Under this narrow standard, the Court will only reverse "if the record is 'devoid of evidence pointing to guilty.'" *Id.* (quoting *United States v. Ruiz*, 860 F.2d 615, 617 (5th Cir. 1988)).

Now, the merits. Count 8 charged Diaz under 18 U.S.C. § 924(j) for using a firearm to commit murder during and in relation to a crime of violence or drug trafficking crime. Similarly, Count 11 charged Diaz under the Violent Crimes in Aid of Racketeering ("VICAR") statute, which penalizes those who commit murder "for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity." 18 U.S.C. § 1959(a). A person is liable as a principal under both statutes if he

"aids, abets, counsels, commands, induces or procures [the crime's] commission." 18 U.S.C. § 2; *see United States v. Hankton*, 51 F.4th 578, 613 (5th Cir. 2022) (affirming aiding-and-abetting conviction under VICAR), *cert. denied*, 143 S. Ct. 839 (2023); *United States v. Foster*, 507 F.3d 233, 246 (4th Cir. 2007) (affirming aiding-and-abetting conviction under section 924(j)). To prove a defendant is liable for aiding and abetting, the Government must show that the defendant "(1) [took] an affirmative act in furtherance of the offense, (2) with the intent of facilitating the offense's commission." *United States v. Carbins*, 882 F.3d 557, 563–64 (5th Cir. 2018) (citation omitted). Diaz apparently does not contest the sufficiency of the evidence as to the intent element. He instead argues that he did not commit any "affirmative act that assisted in the success of the venture."

Diaz's argument misses the mark. The affirmative-act element "comprehends all assistance rendered by words, acts, encouragement, support, or presence . . . even if that aid relates to only one (or some) of a crime's phases or elements." *Rosemond v. United States*, 572 U.S. 65, 73 (2014) (cleaned up); *see United States v. Johnson*, 319 U.S. 503, 515 (1943) ("[A]ll who shared in [the crime's] execution have equal responsibility before the law, whatever may have been the different roles of leadership and subordination among themselves."). Such assistance does not "require[] lending physical aid"—instead, "words may be enough." *United States v. Hansen*, 599 U.S. 762, 771 (2023); *see Twitter, Inc. v. Taamneh*, 598 U.S. 471, 490 (2023) ("[I]ntentional participation can come in many forms . . . such as through words of encouragement or driving the getaway car."). Thus, "a person may be responsible for a crime he has not personally carried out if he helps another to complete its commission." *Rosemond*, 572 U.S. at 70. That is exactly what happened here: although Diaz was not physically present at the scene where Salcido was murdered, he helped Perez-Marrufo complete

its commission through words of encouragement and his readiness to render aid.

While Diaz claims that upholding his convictions for aiding and abetting "would allow Diaz to be convicted for his mere membership in Barrio Azteca," such an argument completely overlooks the reality of the situation on the day of the Consulate Murders. Both Diaz and Perez-Marrufo responded to Benny's radio call directing the Azteca hit teams to go to the location of the Honda Pilot. Diaz was armed from the moment he arrived at the designated location, prepared to carry out whatever Benny (or another superior) ordered him to do. Diaz and Perez-Marrufo then each followed a separate car under Benny's orders to kill the occupants of both.[3] The two sicarios gave each other's hit teams real-time updates via radio, because, as explained above, communication was key to Barrio Azteca operations. At the very least, testimony at trial demonstrated that Diaz aided and abetted in Salcido's murder through "words of encouragement" on the radio throughout the commission of the crime. *See Taamneh*, 598 U.S. at 490. Even further, evidence of the Aztecas' vast communication network was supported by testimony that the Aztecas typically murdered in groups, often with both lookout and support teams. Just because Perez-Marrufo ultimately

---

[3] To the extent Diaz argues that he cannot be held liable for Salcido's murder because Salcido was not the gang's intended victim, the Government directs the Court's attention to the doctrine of transferred intent and notes that "[a] principal is liable for murder if he sets out to commit a murder and, in doing so, committed that act against the wrong person." Br. for Resp't at 29; *see also United States v. Concepcion*, 983 F.2d 369, 382 (2d Cir. 1992) ("It was sufficient for the government to prove that Concepcion, as a member of a RICO enterprise engaged in racketeering activity, set out to commit a proscribed act of violence in order to maintain or increase his position in the enterprise, and that, in the course of so doing, he committed that act against a person who got in his way."). Because Benny ordered the hit teams to kill the occupants of both cars, without regard to who the passengers actually were, it follows naturally that unintended victims would be included in the murders.

did not need Diaz to fire any bullets for Salcido's murder does not mean Diaz was not ready to render such aid, and vice versa. *See United States v. Bell*, 812 F.2d 188, 195 (5th Cir. 1987) ("We decline to carve the defendants' . . . scheme into discrete subparts and to absolve any malefactor who was not physically present at every misdeed."). Rather than acting as "merely a knowing spectator" in Salcido's murder, Diaz acted in concert with Perez-Marrufo's hit team to murder the occupants of both cars. The evidence was therefore sufficient to support Diaz's convictions on Counts 8 and 11.

### d. Consecutive life sentences for section 924(j) convictions

The district court imposed upon Diaz three consecutive life sentences for the convictions under 18 U.S.C. § 924(c) and (j) for using a firearm to commit murder during the course of a crime of violence or drug trafficking crime (Counts 6, 7, and 8). Diaz did not object to these sentences at the time they were imposed. Where a defendant fails to object below, this Court reviews a district court's interpretation of a sentencing statute for plain error. *United States v. Warren*, 986 F.3d 557, 565 (5th Cir. 2021). Error is plain when it is clear or obvious and affects a defendant's substantial rights. *See United States v. Olano*, 507 U.S. 725, 732–33 (1993).

Even under the exacting plain error standard, Diaz is entitled to relief on this issue. The record indicates that the district court believed the consecutive life sentences on these three counts were mandatory. However, while this case was pending, the Supreme Court held that section 924(c)(1)(D)(ii)'s bar on concurrent sentences does not extend to a sentence imposed under section 924(j). *Lora v. United States*, 599 U.S. 453, 455, 458 (2023) ("Subsection (j) contains no consecutive-sentence mandate."). As a result, a district court has discretion to impose a section 924(j) sentence concurrently with another sentence. *Id.* at 464. The district court in Diaz's case did not exercise that discretion.

17

22-50951
c/w No. 22-50956

The parties agree that the sentences for Counts 6, 7, and 8 should be vacated in light of *Lora* and that the matter should be remanded to the district court for resentencing.[4] We agree and remand to the district court for resentencing only as it relates to Diaz's consecutive life sentences on Counts 6, 7, and 8.

### III. Conclusion

For the foregoing reasons, we VACATE AND REMAND as to Diaz's consecutive life sentences for the three section 924(j) convictions, and AFFIRM the remainder of the district court's judgment as to both Diaz and Perez-Marrufo.

---

[4] *See Henderson v. United States*, 568 U.S. 266, 279 (2013) ("[W]e conclude that whether a legal question was settled or unsettled at the time of trial, it is enough that an error be 'plain' at the time of appellate consideration for the second part of the *Olano* test to be satisfied.") (quotation omitted).