**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

Nos. 22-2196, 22-2368
_____

UNITED STATES OF AMERICA

v.

JAMES PERRIN,
                    Appellant 22-2196

UNITED STATES OF AMERICA

v.

PRICE MONTGOMERY,
                    Appellant 22-2368
_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. Nos. 2:14-cr-00205-002, 2:14-cr-00205-001)
Chief District Judge: Honorable Mark R. Hornak
_____

Argued September 19, 2024
_____

BEFORE: RESTREPO, McKEE and SMITH, *Circuit Judges*

(Filed: August 25, 2025)
_____

Keith M. Donoghue [ARGUED]
Brett G. Sweitzer
Lisa Evans Lewis

Federal Community Defender Office
    for the Eastern District of Pennsylvania
601 Walnut Street
The Curtis Center, Suite 540 West
Philadelphia, PA 19106
    (*Attorney for Appellant Perrin*)

Evan J. Austin [ARGUED]
Alison Brill
K. Anthony Thomas
Office of the Federal Public Defender
    For the District of New Jersey
22 South Clinton Avenue
Station Plaza #4, 4th Floor
Trenton, NJ 08609
    (*Attorneys for Appellant Montgomery*)

Matthew S. McHale [ARGUED]
Laura S. Irwin
Eric G. Olshan
Officer of the United States Attorney
700 Grant Street, Suite 4000
Pittsburgh, PA 15219
    (*Attorneys for Appellee*)

_____

OPINION OF THE COURT
_____


RESTREPO, *Circuit Judge*

Price Montgomery and James Perrin ran a profitable drug distribution business, trafficking hundreds of thousands of dollars' worth of heroin into Pennsylvania. A jury convicted both men of numerous drug and gun possession offenses. Additionally, Montgomery was convicted of witness tampering offenses arising from the killing and attempted killing of two women, respectively. On appeal both men raise multiple claims of trial and sentencing errors. We will affirm Perrin's convictions and judgments of sentence. As for Montgomery, we will affirm his convictions and judgments of sentence except the term of imprisonment ordered for using a firearm to

2

kill a witness, which we will vacate and remand for resentencing consistent with this opinion.

## I.

a. The wiretap application.

In the summer of 2013, an informant provided information about Montgomery's drug dealing to the Organized Crime Unit of the Pennsylvania Attorney General's Office. Working with the federal Drug Enforcement Agency (DEA) and the Pittsburgh police, the Unit began an investigation into Montgomery's heroin-trafficking business. The investigation progressed until it became a topic of discussion at the Office's senior leadership meetings, attended by both then-Attorney General Kathleen Kane (AG Kane) and First Deputy Attorney General Adrian King.

Beginning in early 2014, AG Kane expressed her support for pursuing a wiretap to further the investigation, which had become a top priority for the Office's criminal division. Agents from the Organized Crime Unit and DEA began preparing the application to wiretap Montgomery's cellphone with the intention of having AG Kane authorize and submit it on April 14, 2014. On that day, however, AG Kane was scheduled to travel outside the country. Before she left, AG Kane had her assistant Kathryn Smith prepare a letter designating First Deputy King as the acting Attorney General in her absence. AG Kane reviewed the letter but did not sign it, instructing Smith to call and get her permission before signing her name. The evening before her departure, AG Kane spoke with King about the wiretap and verbally authorized him to sign the application in her absence.

On the morning of April 14th, First Deputy King informed Smith that the designation letter needed to be signed before the wiretap application could be submitted. After making numerous attempts to reach AG Kane, Smith signed Kane's name at King's direction. Upon hearing the letter had been signed, AG Kane expressed displeasure but made no attempt to rescind the designation letter or withdraw the wiretap application. The wiretap application, signed by King, was approved by Pennsylvania Superior Court Judge Mary Jane Bowes on April 16, 2014.

Over the course of that summer, AG Kane approved a continuation of the original wiretap as well as submitted

additional applications to wiretap Perrin's phone and a second phone belonging to Montgomery. These applications were also approved by a Pennsylvania state court judge. All told, these wiretaps provided a significant amount of evidence, establishing both the participants and innerworkings of the drug trafficking conspiracy.

b. Evidence of drug trafficking and witness tampering.

The investigation revealed that Montgomery ran a drug-trafficking operation that sourced heroin from Newark, New Jersey to be sold in Pittsburgh, Pennsylvania. Tina Crawford acted as a courier, driving the heroin into Pittsburgh in the trunk of a rental car. Co-defendant Perrin, who agents saw with Montgomery "countless times," supported the business in numerous ways, including traveling with Montgomery to Newark and buying the heroin. A1272.

On June 8, 2014, agents observed Perrin and Montgomery return to Montgomery's house from a trip to Newark. Both men carried bags from the car into the house; Perrin had a suitcase and Montgomery had a brown backpack that agents had seen him carry when meeting with his source. After several hours, the two men left the house and returned to the car. This time the agents stopped the car, arrested both men, and conducted a search. The brown backpack had been at Perrin's feet and contained approximately 125 bricks of heroin, $1,600 in cash, and seven cell phones. After securing a warrant, the agents searched Montgomery's house. There they found a suitcase containing 1,500 bricks of heroin, over $21,000 in cash, 16 firearms, and multiple rounds of ammunition.

Seven of the firearms recovered had been acquired illegally in January 2014. Acting on Montgomery's behalf, Perrin exchanged cash and heroin for 10 guns and ammunition from Jeremiah Pashuta, a heroin addict who had stolen the guns from his brother.[1] One of the guns was a rare .22 Magnum Kel-Tec PMR-30. Pashuta provided ammunition for the Kel-Tec, which required a particular brand of .22 Magnum bullets.

---

[1] Pashuta's brother later testified at trial and identified seven of the guns recovered from Montgomery's home as among those stolen from him.

4

While the Kel-Tec gun was not recovered during the search of Montgomery's house, agents found .22 Magnum bullets.

The next day, on June 9, 2014, agents searched the home of Tina Crawford, Montgomery's courier who had transported heroin from Newark to Pittsburgh approximately eight times. Tina spoke with the agents conducting the search and admitted her role in the drug-trafficking operation. Montgomery, who had posted bond and been released from custody, visited Tina after the search. Tina told Montgomery that she shared no information with the agents. Later, however, she confided to their mutual friend Khrysta Brown that she told the agents she transported bags for Montgomery but did not know what they contained. She also told Brown that she had to meet with an attorney. Brown, acting as an intermediary, relayed her conversations with Tina to Montgomery.

After the search of her home, Tina moved in with her mother, Patsy Crawford. On August 22, 2014, Tina and Brown exchanged text messages. Approximately thirty-five minutes later, Tina left the house with Patsy, who had agreed to drive Tina to a meeting with federal prosecutors after her ride failed to show. Upon reaching Patsy's car, the two women were ambushed in their driveway. Two or three assailants opened fire and continued to shoot until a neighbor came out of her house and screamed. The assailants, who masked their faces with the hoods of their sweatshirts, fled the scene in a car. Tina Crawford was shot eight times and died on the floor of the garage; her body lay next to the passenger side of the car. Patsy, found on the driver's side, had been shot multiple times but remained conscious and was yelling for her daughter. A police sergeant at the scene described Patsy as being in critical condition.

Law enforcement recovered twenty-four casings from the scene, including casings from the .22 Magnum bullets used in the rare Kel-Tec handgun Perrin bought from Pashuta. Also recovered was an abandoned cellphone on the sidewalk near the Crawfords' home. Investigators tied the phone to Montgomery by comparing its contact lists, call logs, and frequently used cell towers to another one of his cell phones. Montgomery was also tied to the phone through DNA analytics, which identified him as a possible match for the DNA found on the phone.

At the time of the murder, Montgomery was free on bond awaiting state charges. Immediately after the murder he violated the terms of his bond and fled Pittsburgh. He was found living in Columbus, Ohio under a false name in February 2015. Perrin also went on the run but was later taken into custody.

c.    Charges

On April 4, 2016, Montgomery and Perrin were charged by a grand jury of multiple crimes: Count 1 charged both men with conspiring to possess with the intent to distribute heroin from on or about April 2013 to June 2014; Count 2 charged both men with possession with intent to distribute heroin "on or about June 8, 2014," the day of their initial arrest; Counts 3 and 4 charged each man, respectively, with unlawful possession of a firearm as a convicted felon also "on or about June 8, 2014"; and Count 5 charged both men with possessing firearms in furtherance of a drug trafficking crime, which the indictment specified as the possession with intent to deliver heroin charge in Count 2. A178-85.

Montgomery was charged with additional counts: Count 6 charged him with conspiring to launder money; Counts 7 and 9 charged him with killing Tina Crawford and attempting to kill her mother, Patsy, to prevent them from communicating with law enforcement; Count 8 charged him with using a gun to kill Tina, a crime committed "with malice aforethought" and "by shooting her with a firearm willfully, deliberately, maliciously and with premeditation"; and Count 10 charged him with using a gun to commit the attempted murder of Patsy Crawford. Montgomery was also charged as an accomplice for each of these counts. A186-91.[2]

_____

[2] The specific charges associated with each count are as follows: Count 1 charged violations of 21 U.S.C. §§ 846, 841(a)(1), (b)(1)(A)(i); Count 2 charged violations of 21 U.S.C. §§ 841 (a)(1), (b)(1)(A)(i); Count 3 charged violations of 18 U.S.C. §§ 2, 922(g)(1), 924(e); Count 4 charged violations of 18 U.S.C. §§ 2, 922(g)(1); Count 5 charged a violation of 18 U.S.C. § 924(c)(1)(A)(i); Count 6 charged a violation of 18 U.S.C. § 1956(h); Counts 7 and 9 charged violations of 18 U.S.C. §§ 2, 1512(a)(1)(C); Count 8 charged a violation of 18 U.S.C. §§ 2, 924(c)(1)(A), (c)(1)(C)(i), (j)(1);

d. Motion to suppress.

Prior to trial, both Montgomery and Perrin sought to suppress the evidence derived from the wiretap of Montgomery's phone under Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2516-18. They argued suppression was warranted under Title III because the wiretap order was issued in violation of applicable state law, namely the Pennsylvania Wiretapping and Electronic Surveillance Control Act, 18 Pa. C.S. § 5701 *et seq.* (the Wiretap Act). Montgomery and Perrin argued the Act required that the wiretap application be signed by an official AG Kane had designated in writing. Because AG Kane had not signed the written designation letter herself, they claimed the application signed by First Deputy King was unauthorized under both federal and state law and that all wiretapped evidence should therefore be suppressed.

The District Court denied the motion, ruling that Pennsylvania law allows for non-written designations in circumstances where, as here, the Attorney General is absent "in circumstances fraught with uncertainty as to her whereabouts and accessibility." A47. Specifically, the Court found that First Deputy King was authorized to sign the application under both Pennsylvania's Administrative Code, 71 P.S. § 73, and the Commonwealth Attorneys Act, 71 P.S. §§ 732-201, 762. It further ruled that, because the wiretap application was authorized under Pennsylvania law, the requirement in Title III subsection 2516(2) that a "high-ranking executive law enforcement official approve such an application" was satisfied. A52.[3]

e. Verdict and sentences

In November 2018, a jury convicted Montgomery and Perrin of all counts. Montgomery was sentenced to life

and Count 10 charged violations of 18 U.S.C. §§ 2, 924(c)(1)(A), (c)(1)(C)(i).

[3] Also prior to trial, the District Court ordered the parties to submit an agreed-upon set of proposed jury instructions. The government complied, submitting instructions with a statement that the instructions had been approved by the parties. Neither Perrin nor Montgomery raised objections to the instructions before or during the trial.

7

imprisonment for the killing of Tina Crawford, with an additional consecutive term of eighty years imprisonment for the remaining counts. Perrin was sentenced to 380 months imprisonment, followed by ten years supervised release. This appeal followed. [4]

## II.[5]

In an argument joined by co-defendant Montgomery on appeal, Perrin challenges the District Court's denial of their joint motion to suppress. He argues suppression of the wiretap evidence was warranted because the Pennsylvania Attorney General's wiretap application was unauthorized under both federal and state law. His challenge is two-fold. First, he argues that Title III prohibits a state's principal prosecuting attorney from delegating their authority to apply for wiretaps, rendering the application signed by First Deputy King directly violative of 18 U.S.C. § 2156(2).[6] Second, he appeals the

---

[4] Specifically, the District Court sentenced Perrin to an aggregate term of imprisonment of 320 months for Counts 1, 2 and 3 to run concurrently with one another, with the sentence of 60 months for Count 5 to run consecutively. For Montgomery, the Court imposed a life sentence for Count 7 with the sentences for Counts 1, 2, 4, 6, and 9 to run concurrently. Consecutive to the life sentence, the Court imposed an aggregate term of imprisonment of 960 months for Counts 5, 8, and 10.

[5] The District Court had subject matter jurisdiction under 18 U.S.C. § 3231. We have appellate jurisdiction under 18 U.S.C. § 3742 and 28 U.S.C. § 1291.

[6] The relevant text of 18 U.S.C. § 2516(2) is as follows:

(2) The principal prosecuting attorney of any State, or the principal prosecuting attorney of any political subdivision thereof, if such attorney is authorized by a statute of that State to make application to a State court judge of competent jurisdiction for an order authorizing or approving the interception of wire, oral, or electronic communications, may apply to such judge for, and such judge may grant in conformity with

8

denial of his suppression motion, again raising the claim that the application was unauthorized under state law because King was not designated in writing as required by Pennsylvania's Wiretap Act. This alleged failure to abide by Pennsylvania law, the argument goes, indirectly violated Title III because it transgressed the Act's core concern of establishing accountability for the wiretap's execution. Perrin argues these alleged violations rendered the wiretap application unauthorized and the resultant evidence unlawfully intercepted. Because we conclude Title III's authorization requirements have been substantially complied with and the Act's statutory purpose has been satisfied, we agree with the District Court that suppression is not warranted.

To prove suppression of the wiretapped evidence is justified, Perrin and Montgomery must first establish the government unlawfully intercepted their wiretapped communications. 18 U.S.C. § 2518(10)(a)(i).[7] They must then

> section 2518 of this chapter and with the applicable State statute an order authorizing, or approving the interception of wire, oral, or electronic communications by investigative or law enforcement officers having responsibility for the investigation of the offense as to which the application is made, when such interception may provide or has provided evidence of the commission of the offense of . . . dealing in narcotic drugs, marijuana or other dangerous drugs . . . or any conspiracy to commit any of the foregoing offenses.

[7] The text of 18 U.S.C. § 2518(10)(a)(i) is as follows:

> (10)(a) Any aggrieved person in any trial, hearing, or proceeding in or before any court, department, officer, agency, regulatory body, or other authority of the United States, a State, or a political subdivision thereof, may move to suppress the contents of any wire or oral communication intercepted pursuant to this chapter, or evidence derived therefrom, on the grounds that—

9

prove the unlawful interception violated "those statutory requirements that directly and substantially implement the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device." *United States v. Giordano*, 416 U.S. 505, 527 (1974). We must therefore identify which requirements "occupy a central, or even functional, role in guarding against unwarranted use" of wiretaps. *United States v. Chavez*, 416 U.S. 562, 578 (1974). Relevant to this appeal are the requirements for the authorization of state wiretap applications set forth in Title III's subsection 2516(2), intended to "establish uniform standards . . . governing the authorization of interceptions, and to ensure adherence to these standards through centralizing responsibility in top level state and county prosecutors who can be held accountable for departures from preestablished policy." *United States v. Smith*, 726 F.2d 852, 856 (1st Cir. 1984).

Because we are primarily concerned with implementing Congress's intent, not every failure to comply with state or federal authorization requirements warrants suppression. Suppression motions premised on authorization errors can be denied "on the ground of substantial compliance with Title III requirements." *Chavez*, 416 U.S. at 568 n.2. Put another way, when assessing such alleged errors, this Court will not suppress evidence over a mere technical defect in authorization procedures if the statute's underlying purpose has been met. *United States v. Acon*, 513 F.2d 513, 517 (3d Cir. 1975).

Perrin argues, for the first time on appeal, that the Pennsylvania Attorney General's application directly violated Title III because subsection 2516(2) does not allow a state's principal prosecuting attorney to delegate their authority to apply for a wiretap. His argument is premised on the plain language of Title III's section 2516, which identifies those officials who are authorized to submit wiretap applications. While the subsection addressing federal wiretaps names the delegate of the United States Attorney General as such an official, *see* 18 U.S.C. § 2516(1), the subsection addressing state wiretaps does not name the delegate of a state's principal prosecuting attorney as having such authority, *see* 18 U.S.C. §

---

(i) the communication was unlawfully intercepted.

10

2516(2). Perrin contends this omission means that such a delegation violates Title III. He argues in the alternative that, if such a delegation of authority is permitted on the state level, the principal prosecuting attorney of a state must personally review the wiretap application to substantially comply with the purpose behind Title III's authorization requirements. Perrin contends AG Kane's alleged failure to personally review the Montgomery wiretap application signed by First Deputy King rendered it unauthorized.

Because this argument regarding the direct violation of subsection 2516(2) was not raised before the suppression court, we will review for plain error. "Under that test, before an appellate court can correct an error not raised at trial, there must be (1) 'error,' (2) that is 'plain,' and (3) that 'affect[s] substantial rights.'" *Johnson v. United States*, 520 U.S. 461, 466-67 (1997) (alteration in original) (quoting *United States v. Olano*, 507 U.S. 725, 732 (1993)). To be "plain," an error must be "clear under current law." *Id.* at 467 (internal quotation marks omitted). Even if these three conditions are met, however, we may exercise our discretion to correct the error only if it (4) "seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *Id.* (alternation in original) (quoting *Olano*, 507 U.S. at 732) (internal quotation marks omitted).

We disagree that subsection 2516(2) prohibits a state's principal prosecuting attorney from delegating their authority to approve and submit wiretap applications. Instead, the statute recognizes that whether such a delegation is permitted is dictated by state law, not by Title III. The plain language of subsection 2516(2) defers to state statutes three times to illustrate Congress's intention to keep procedures for authorizing wiretaps under a state's purview when implementing Title III's statutory mandates. 18 U.S.C. § 2516(2); *United States v. Johnson*, 696 F.2d 115, 121 (D.C. Cir. 1982). Interpreting subsection 2516(2) to render null and void those Pennsylvania statutes allowing the state Attorney General to delegate his or her authority would be diametrically opposed to Congress's clear direction.[8]

---

[8] The Senate Report introducing subsection 2516(2) expressly stated that "[t]he issue of delegation by that [state's principal prosecuting attorney] would be a question of State Law." S.

11

In addition to consistency with Congressional intent, allowing state principal prosecutors to delegate their authority makes good sense. We agree with the Second and Ninth Circuits that "Congress simply could not have intended that local wiretap activity would be completely suspended during the absence or disability of the official specifically named in [Section 2516(2)]." *United States v. Perez-Valencia*, 727 F.3d 852, 855 (9th Cir. 2013) (quoting *United States v. Fury*, 554 F.2d 522, 527 n.4 (2nd Cir. 1977)). Where the principal prosecutor of the state is unavailable or indisposed, as was the case here, it would be unreasonable to expect all state wiretap applications to remain on hold.

---

Rep. No. 1097, 2187, 90th Cong. 2d Sess. (1968). The report explained that the state officer authorized to apply for a wiretap would depend on "not name but function" and who serves that function would be dictated by state law. *Id*. Those laws would, in turn, serve to create a "centralization of policy" regarding electronic surveillance. *Id*. Senator McClellan, when presenting Title III on the senate floor, recognized that state laws would permit such a delegation of authority:

> Initially, approval of all applications will have to be secured from the appropriate chief prosecuting officer. On the federal level, that will be the Attorney General or his special designee, while on the state level, that will be the State Attorney General or the District Attorney of a county *or their special designees.* This provision will centralize authority and responsibility for the formulation of policy in this area in a visible, usually political accountable, individual. This should be a strong safeguard against abuse.

114 Cong. Rec. 11,208 (1968) (emphasis added). Indeed, more than merely approving wiretap applications, Congress acknowledged that state designees could further Title III's statutory purpose of bringing uniformity and accountability to the use of electronic surveillance. *Id.*

12

Perrin argues in the alternative that, if the authority to apply for a wiretap can be delegated under subsection 2516(2), the principal prosecuting attorney must remain actively involved and be personally familiar with the application to satisfy Congress's objectives in enacting Title III.[9]  He claims that such a requirement was not met in this case, where there was "no sign Kane personally reviewed the wiretap application" or was even aware of the circumstances justifying electronic surveillance.  Perrin Br. 32.  The government counters that there is no such "personal review" requirement in this Circuit or any other and, to the extent familiarity with the application was required under Title III, AG Kane in this instance was actively involved in the process of applying for the wiretap.

Given the absence of precedent in this Circuit clarifying the role a state's principal prosecuting attorney must play after delegating their authority to apply for a wiretap, we first hold that any error in the Attorney General's review of the application post-delegation was not plain.  We will find plain error only if it is "absolutely clear legal norms compel that conclusion." *United States v. Cammarata*, 129 F.4th 193, 224 (3d Cir. 2025) (internal citations omitted).  Second, we note that the plain text of subsection 2516(2) does not prescribe what role a principal prosecuting attorney should play after delegating their authority.  Instead, as discussed above, we interpret the subsection to leave the issue of delegation by the principal prosecutor to state law, which means state legislatures—not federal courts—determine the scope and nature of the designees' duties.  Even if Title III preempts a

---

[9] Perrin supports this argument by citing cases from the First and Ninth Circuits. *See e.g., United States v. Smith*, 726 F.2d 852, 859 (1st Cir. 1984) (holding "[t]he detailed review by a district attorney of every application for a proposed use of electronic surveillance on a case by case basis . . . would seem to satisfy fully the congressional objectives"); *Villa v. Maricopa County*, 865 F.3d 1224, 1234 (9th Cir. 2017) (holding that substantial compliance with Title III requires that principal prosecuting attorney be "personally familiar" with the facts underlying an application). *See also United States v. Lyons*, 740 F.3d 702, 721 (1st Cir. 2014) (noting that Massachusetts law requires principal prosecuting attorney to "personally review" the wiretap application).

13

state's wiretapping laws, that does not give this Court license to dictate what roles state officers play. Our role is to determine whether the officers have substantially complied with Title III's statutory requirements. If this Court were to dictate the conduct of a state's principal prosecuting attorney after they had exercised their statutory right to delegate their authority, we run the risk of intruding into an area which Congress has deemed best left for state law. Not only would we be overreaching if we were to define the role of Pennsylvania's Attorney Generals but not their federal counterparts, we would be implying that state officials require special scrutiny and oversight.[10]

We therefore decline Perrin's invitation to hold that AG Kane violated Title III by not "personally reviewing" the wiretap application after she delegated her authority to submit the application. Not only does Title III's plain language not support such a holding, but requiring such a level of personal involvement invites non-compliance. If the principal prosecuting attorney designated her authority in anticipation of an extended absence, expecting her personal review of each wiretap application would be unreasonable and possibly unattainable. We therefore conclude that the designee of the state's principal prosecuting attorney, if properly authorized under state law, may submit a wiretap application under

---

[10] The Ninth Circuit recognized that, in reviewing wiretap applications out of the federal Attorney General's office, there is "no requirement in 18 U.S.C. § 2516 or anywhere else that the authorizing official explain the reasons for [giving his authorization]." *United States v. Martinez*, 588 F.2d 1227, 1233 (9th Cir. 1978). Instead, "[o]nce a proper authorizing officer is properly identified, . . . thereby fixing on him the responsibility for a particular authorization," compliance with subsection 2516(1) is met. *United States v. Turner*, 528 F.2d 143, 151 (9th Cir. 1975). The reasons or methods used in giving such authorization are not subject to review by courts; "[r]ather it is []presumed that the officer has properly exercised the judgment called for by the statute" when they sign their name to authorize a wiretap application. *Id.* (rejecting argument that the Attorney General or specially designated Assistant Attorney General must personally review facts in application). We can think of no reason why the same deference should not be awarded a state's counterpart.

14

subsection 2516(2). Our purview, therefore, is to determine whether the application meets the authorization requirements of Title III and whether Title III's protections against unwarranted wiretaps are upheld. *Chavez*, 416 U.S. at 578.

This brings us to the claim Perrin and Montgomery raised before the suppression court: that First Deputy King was not authorized under Pennsylvania law to submit the wiretap application because AG Kane failed to sign the letter granting him such authority. They argued that the alleged violation of Pennsylvania law meant King was not authorized to submit the application under subsection 2516(2) and suppression was warranted because the wiretap evidence was unlawfully intercepted under subsection 2518(10)(a). The District Court disagreed.

"Where a motion to suppress has been denied, we review the order for clear error as to the underlying facts, but exercise plenary review as to its legality in the light of the court's properly found facts." *United States v. Davis*, 726 F.3d 434, 439 (3d Cir. 2013) (quoting *United States v. Brownlee*, 454 F.3d 131, 137 (3d Cir. 2006)). The District Court found that AG Kane failed to designate First Deputy King in writing but ruled this failure did not justify suppressing the wiretap evidence under Title III.[11] We will affirm this ruling.

Again, violations of even Title III's "central requirements" do not warrant suppression "if the Government demonstrates to the court's satisfaction that [Title III's] statutory purpose has been achieved despite the violation." *Johnson*, 696 F.2d at 121. First Deputy King's signing of the application, assuming he was not authorized to do so under Pennsylvania law, warrants suppression only if Title III's purpose of centralizing authorization "in a publicly responsible official" so that "the lines of responsibility [will] lead to an

---

[11] The District Court denied the suppression motion because First Deputy King, while arguably not authorized to sign the wiretap application under the Pennsylvania Wiretap Act, was authorized to sign under other applicable Pennsylvania statutes. We agree with this reasoning but also recognize that we generally "decide evidence questions in federal criminal cases on the basis of federal, rather than state, law." *United States v. Williams*, 124 F.3d 411, 428 (3d Cir. 1997) (citing *United States v. Rickus*, 737 F.2d 360, 363 (3d Cir. 1984)).

identifiable person" was not achieved. *Giordano*, 416 U.S. at 520 (quoting S. Rep. No. 1097, 90th Cong., 2d Sess., at 96–97 (1968)).

To determine whether there was substantial compliance with the substantive requirements of the statute, we look "beyond the face of the [wiretap] order to the facts as they actually existed[.]" *United States v. Traitz*, 871 F.2d 368, 379 (3d Cir. 1989) (citing *Acon*, 513 F.2d at 518). Here, the District Court decided that King was authorized by AG Kane despite the lack of written designation. It found credible First Deputy King's suppression hearing testimony that he had a conversation with AG Kane the evening before her departure, where she "orally and actually directed" him to submit the application the following day. A51. The Court also found relevant that AG Kane, who did not testify at the hearing, knew that First Deputy King had signed the wiretap application before it was presented to a Pennsylvania judge and "did nothing to stop that presentation." A52. All told, the District Court found the weight of the evidence established that "authorization in fact occurred" under Pennsylvania law, rendering the requirements of Title III's subsection 2516(2) substantially fulfilled. A52. Because these facts were properly found, the denial of the suppression motion was proper.

## III.

Perrin, again with Montgomery joining, argues the government and the District Court constructively amended Count 5 of the indictment. Count 5 charged that Montgomery and Perrin each violated 18 U.S.C. § 924(c) by possessing firearms in furtherance of the charge in Count 2, possession of heroin with the intent to deliver "on or about June 8, 2014." A179. Perrin claims the government instead argued at trial that their firearms possession furthered the drug trafficking conspiracy charged in Count 1, which alleged the conspiracy existed from April 2013 until June 2014. He contends the District Court compounded the government's error by instructing the jury that they could convict under Count 5 if the defendants possessed the guns to further either the June 8th possession offense (Count 2) or the drug trafficking conspiracy (Count 1). According to Perrin, both subsection 924(c) convictions must be vacated because these errors lowered the government's burden of proof by lengthening the period of time—from one day to over a year—during which the jury

16

could find their possession of firearms furthered a drug trafficking offense.

Neither defendant raised this argument before the District Court so we will again review for plain error. *Johnson*, 520 U.S. at 465–66. We conclude that this constructive amendment claim fails under the final condition: whether the error alleged "seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *Id.* at 467 (alteration in original) (quoting *United States v. Young*, 470 U.S. 1, 15 (1985)). Accordingly, we decline to exercise our discretion to grant relief.

In the constructive amendment context, the fourth condition of plain error is difficult to overcome if there is strong evidence proving guilt of the crime as charged. Even if the government and the District Court plainly erred by constructively amending Count 5, such an error did not seriously affect the proceedings' fairness, integrity, or reputation if the record was largely uncontroverted and overwhelmingly proved the crime described in the indictment. *See United States v. Greenspan*, 923 F.3d 138, 152 (3d Cir. 2019). Neither defendant contests their conviction for possessing firearms on June 8, 2014 (Counts 3 and 4, respectively) or their conviction for possessing heroin with the intent to deliver on June 8, 2014 (Count 2). The only dispute, therefore, is whether the record established that they possessed the firearms to further their intent to deliver the heroin found in their possession on June 8, 2014. If we conclude that evidence sustaining Count 5 was overwhelming and uncontroverted, there was no reversible error. *See Id.*

To further a drug trafficking offense, the "mere presence of a gun" at the same location as the drugs is not enough. *United States v. Sparrow*, 371 F.3d 851, 853 (3d Cir. 2004) (internal quotation marks omitted). Instead, the evidence must establish a connection between the two crimes, whereby the guns "advanced or helped forward" the drug dealing offense. *Id.* To determine whether such a connection exists, this Court has applied these nonexclusive factors:

> the type of drug activity that is being conducted, accessibility of the firearm, the type of the weapon, whether the weapon is stolen, the status of the possession (legitimate or illegal), whether

17

the gun is loaded, proximity to drugs or drug profits, and the time and circumstances under which the gun is found.

*Id.* (quoting *United States v. Ceballos-Torres*, 218 F.3d 409, 414–15 (5th Cir. 2000)).

On June 8, 2014, law enforcement watched the defendants return to Montgomery's home from a trip to New Jersey, where they had met with their heroin supplier. Hours later, the men returned to the car with a backpack. The agents conducted a traffic stop and searched the car, finding $1,600 in cash, seven cell phones, and 125 bricks of heroin in the backpack. After obtaining a warrant, the agents searched Montgomery's house and found 1,500 bricks of heroin, 16 guns stored with ammunition in the basement and master bedroom, $21,000 in cash in the master bedroom and bathroom, a money counter, and a cutting agent for the heroin.

Applied to this evidence, the *Ceballos-Torres* factors overwhelmingly support a conviction under Count 5 as it appears in the indictment. The car and house contained a significant amount of heroin and drug paraphernalia on June 8, 2014, establishing that Perrin and Montgomery intended to traffic the heroin. The guns were accessible to the occupants, including a rifle found behind the headboard in the master bedroom. The guns, consisting of shotguns, handguns, a TEC-9 and a knock-off AK-47, were lethal firearms. Seven of the recovered firearms were traced back to the transaction between Perrin and Jeremiah Pashuta, where Perrin gave cash and heroin to Pashuta for stolen guns and ammunition. Due to prior convictions, neither Perrin nor Montgomery could lawfully purchase or possess firearms. While the record did not specify whether the guns were loaded, testimony established that they were stored with ammunition. They were found in various places within the same house as $21,000 in drug proceeds and $300,000 worth of heroin. The search of the house was the culmination of a year-long investigation, during which law enforcement learned that the defendants ran an expansive and profitable drug operation that employed couriers to transport heroin across state lines.

More than merely sufficient, the evidence that the guns furthered the heroin distribution business was overwhelming and uncontroverted, which means any error at trial did not

18

seriously affect the proceeding's fairness. *See, e.g., United States v. Thomas*, 970 F.3d 809, 817 (7th Cir. 2020) (holding evidence that guns possessed in furtherance of drug offense was overwhelming where drugs and loaded guns were within reach of one another in same location); *United States v. Robinson*, 435 F.3d 1244, 1251 (10th Cir. 2006) (deeming evidence of subsection 924(c) violation overwhelming where rifle found in close proximity of drug manufacturing and paraphernalia). Relevant to our analysis is that neither Perrin nor Montgomery point to any portion of the record that refutes the inference that the guns were integral to their business, nor do they present a "plausible argument" that the guns did not advance their plans to distribute the heroin uncovered on June 8, 2014. *Johnson*, 520 U.S. at 470. Moreover, in analyzing the fourth prong of plain error review, this Court may view the alleged error "against the entire record" when deciding whether it "seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings." *Young*, 470 U.S. at 15–16 (quoting *United States v. Atkinson*, 297 U.S. 157, 160 (1936)). Viewed in this context, any claim of plain error is further undermined by the fact that heroin was used to acquire seven of the recovered guns, and the same type of ammunition found in the house was used to shoot Tina Crawford to prevent her cooperation with law enforcement. Because guns indisputably advanced the plans to distribute the 1,625 bricks of heroin found in the same house, any error causing Count 5 to be constructively amended did not "undermine the fundamental fairness of the trial and contribute to a miscarriage of justice." *Id*. at 16.

Finally, we note that Perrin and Montgomery, together with the government, jointly submitted the jury instruction that gave rise to this claim of court error. The proposed charge for Count 5, which the District Court adopted, instructed the jury to determine whether the firearms, if knowingly possessed, were held in furtherance of the drug trafficking crimes alleged in both Counts 1 and 2. Although we do not deem this claim waived and foreclosed from review, *see Virgin Islands v. Rosa*, 399 F.3d 283, 290–91 (3d Cir. 2005), we recognize it is difficult for Appellants to overcome the fourth prong of plain error review if their own conduct invited the error. 7 Wayne R. LaFave, et al., Criminal Procedure § 27.5(d) (4th ed. 2015) ("A court is unlikely to find the fourth prong met if conduct by the defense 'invited' the error" even if "the reviewing court

19

concluded those actions fell short of 'waiver.'"); *see, e.g., United States v. Lespier*, 725 F.3d 437, 450–51 (4th Cir. 2013) (holding defendant's conviction of greater offense after he opposed instruction on a lesser-included offense did not threaten integrity of the justice system or represent a miscarriage of justice under plain error review). Given the overwhelming evidence proving the crime as charged and the fact that Perrin and Montgomery proposed the instruction underlying their convictions, any error here did not rise to the level of plain error. We will therefore affirm their convictions under Count 5.

## IV.

Montgomery next challenges the legality of his life sentence. Count 7 of the indictment charged him with killing Tina Crawford to prevent her from communicating with law enforcement in violation of 18 U.S.C. § 1512(a)(1)(C).[12] Montgomery argues that, because the type of "killing" was not specified in the charge or the District Court's jury instruction, he was charged and convicted of manslaughter, not murder. As a result, his sentence of life imprisonment under Count 7 violates his Fifth and Sixth Amendment rights under *Apprendi* and *Alleyne*.

*Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000) held that any fact that increases the penalty of the crime beyond the statutory maximum must be submitted to the jury. *Alleyne v. United States*, 570 U.S. 99, 103 (2013) held that any fact that increases a sentence beyond the minimum mandatory sentence must be submitted to a jury. Montgomery alleges both

---

[12] The relevant portion of 18 U.S.C. § 1512 is as follows:

> **(a)(1)** Whoever kills or attempts to kill another person, with intent to—
>   *   *   *
> **(C)** prevent the communication by any person to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation, parole, or release pending judicial proceedings; shall be punished as provided in paragraph (3).

20

holdings were violated because his life sentence exceeds both the statutory maximum and mandatory minimum sentences for manslaughter.

This *Apprendi* and *Alleyne* claim was preserved so we will apply a harmless error standard of review. *United States v. Vasquez*, 271 F.3d 93, 103 (3d Cir. 2001). Montgomery contends that he alleges a sentencing error because he was charged and convicted of manslaughter but sentenced for murder. Under a sentencing error analysis, an error is harmless if it did not contribute to the sentence imposed. *United States v. Lewis*, 802 F.3d 449, 456 (3d Cir. 2015). Montgomery argues the error of being sentenced for a crime more serious than the one for which he was convicted cannot be deemed harmless.

Montgomery's characterization of his claim—that he was charged and convicted only of manslaughter—is unavailing. Count 7 charged Montgomery with killing Tina Crawford with the intention of preventing the communication of information relating to a federal offense to a federal law enforcement officer. The intention behind the killing is therefore an element of the crime defined in subsection 1512(a)(1)(C).[13] Killing a witness to prevent her from talking to law enforcement in violation of subsection 15(a)(1)(C) encompasses an unlawful killing with malice aforethought, in other words, murder. Montgomery was not therefore sentenced for a different crime than he was charged and convicted. Accordingly, a harmless trial error analysis is appropriate. *See United States v. Johnson*, 899 F.3d 191, 198 (3d Cir. 2018) (concluding *Alleyne* error was trial error where defendant was charged with the same crime for which he was sentenced, but an element was not submitted to the jury). Thus, in assessing Montgomery's *Apprendi/Alleyne* claim, we must

---

[13] Murder is defined in 18 U.S.C. § 1111(a) as "the unlawful killing of a human being with malice aforethought." If the killing is "willful, deliberate, malicious, and premeditated," it is murder in the first degree and is punishable by life imprisonment or death. 18 U.S.C. § 1111(a) and (b). Any other murder is second degree murder, punishable by imprisonment for any term of years or for life. *Id.* Life imprisonment is therefore a legal sentence for either first- or second-degree murder. *See id.*

determine whether a rational jury would have still found Montgomery guilty beyond a reasonable doubt of killing Tina Crawford under Count 7 if the elements of murder had been submitted to the jury. *Id.* at 200 (quoting *Lewis*, 802 F.3d at 456).

We conclude a rational jury would have found Montgomery guilty of Tina Crawford's murder because the elements of first-degree murder were submitted to the jury under a different count. Count 8 charged Montgomery with using a firearm to kill Tina in violation of subsection 1512(a)(1)(c), as charged in Count 7. Count 8 described the killing as "a murder as defined in 18 U.S.C. § 1111," where Tina Crawford was killed "with malice aforethought" and "willingly, deliberately, maliciously and with premeditation." A189. The jury instruction for Count 7 and Count 8 was as follows:

> Count 7 of the indictment charges Price Montgomery with tampering with a witness by killing a person on or about August 22, 2014.
>
> In order to find the defendant Price Montgomery guilty of this offense, you must find that the government proved each of the following four elements beyond a reasonable doubt: First, that Mr. Montgomery killed Tina Crawford. Second, that he was motivated by a desire to prevent the communication between Tina Crawford and law enforcement authorities concerning the commission or possible commission of the offense described in Count 2 [trafficking heroin]. Third, that the offense described in Count 2 was actually a federal offense. Fourth, that he believed that there was a reasonable likelihood that Tina Crawford would, in fact, make a relevant communication to law enforcement authorities.
>
> \*   \*   \*   \*
>
> Mr. Montgomery is charged at Count 8 with using and discharging a firearm in relation to a crime of violence resulting in death on or about August the 22, 2014.

22

Count 8 of the indictment charges Price Montgomery with carrying, using, and discharging a firearm during a crime of violence, specifically the crime charged at Count 7. I instruct you that the offense alleged in Count 7 is a crime of violence.

In order to find Price Montgomery guilty of the offense charged at Count 8 of the indictment, you must find the prosecution proved each of the following four elements beyond a reasonable doubt: First, that Price Montgomery committed the crime of tampering with a witness by killing a person as charged at Count 7. Second, that the killing was a murder, that is, a willful, deliberate, malicious, premeditated killing. Third, that during and in relation to the commission of that crime, Price Montgomery knowingly carried or used a firearm.

\*      \*      \*      \*

Fourth, that Price Montgomery carried or used the firearm during and in relation to the crime of tampering with a witness by killing a person.

A2328–31 (emphasis added). The jury found Montgomery guilty of Count 8, thereby establishing that it found the killing of Tina Crawford constituted first-degree murder. The District Court did not err in relying on these findings in imposing a life sentence for Count 7. Because the elements of first-degree murder were submitted to the jury, the sentence of life imprisonment for killing Tina Crawford did not violate *Apprendi* or *Alleyne*, nor, by extension, the Sixth Amendment.

This conclusion is supported by the prior conviction exception to the *Apprendi* and *Alleyne* rules. A defendant's prior conviction, arising from a previous judicial proceeding, can impact the minimum or maximum statutory sentence without running afoul of *Apprendi* and *Alleyne*. It would make little sense for us to conclude that the District Court can base a sentence on a jury's findings from a prior proceeding but not the jury's findings from the same trial. Because this jury found the necessary elements of first-degree murder beyond a reasonable doubt, we agree with the government that granting

23

Montgomery a new trial would result in another fact-finder making the same factual determinations that the jury made here.

Montgomery does not refute that the elements of first-degree murder were before and found by the jury. Nor does he claim the facts of record were insufficient to sustain either conviction tied to the killing of Tina Crawford. He instead argues that the elements of first-degree murder found under Count 8 could not be applied to his sentence for Count 7 because the text of Count 7 did not incorporate the allegations in Count 8 by reference. Citing our decision in *United States v. Stevenson*, 832 F.3d 412, 425 (3d Cir. 2016), Montgomery argues applying the elements found under Count 8 to the sentence imposed for Count 7 would violate his Fifth and Sixth Amendment rights because he did not receive notice of his potential life sentence for witness tampering by murder.

Initially, we note that this argument conflates the issue of whether the indictment provided Montgomery with notice with the issue of whether his sentence was in accordance with *Apprendi* and *Alleyne*. Montgomery's invoking our holding in *Stevenson* does not challenge our decision that the District Court imposed a life sentence based on facts the jury found beyond a reasonable doubt. When determining whether a count provides a defendant with notice of charges, *Stevenson* requires that we regard each count in isolation, independently of the other counts in the indictment. There is no equivalent requirement that courts consider each jury *finding* in isolation when constructing a sentence. The findings supporting the life sentence were made by the jury and for that reason his punishment under Count 7 did not run afoul of *Apprendi* or *Alleyne*.[14]

---

[14] In any event, Count 7 provided Montgomery with notice that he faced a potential life sentence. The count conveyed that Montgomery was being charged with killing a witness to prevent her from speaking with law enforcement. He was charged with an intentional killing and therefore given notice of the "species of offence" facing him prior to trial. *Apprendi*, 530 U.S. at 478. Here, the "species" included murder in either the first- or second-degree, both of which carry potential life sentences. Under the notice argument as well, therefore, Montgomery is not entitled to relief.

We will therefore affirm Montgomery's life sentence for the killing of Tina Crawford in violation of 18 U.S.C. § 1512(a)(1)(C).

V.

Montgomery next claims his trial counsel's assistance was ineffective for not objecting to the District Court's instruction defining aiding and abetting liability for Counts 8 and 10, charging violations of 18 U.S.C. § 924(c). Specifically, he asserts the Court failed to instruct the jury that accomplice liability requires a finding that he possessed advance knowledge that a gun would be used to kill Tina Crawford and attempt to kill her mother Patsy, as mandated by *Rosemond v. United States*, 572 U.S. 65 (2014). Montgomery contends both convictions must be vacated because the jury could have convicted him without finding all the elements of either crime.

Montgomery recognizes that, because his counsel jointly submitted the proposed jury instructions, the invited error doctrine prohibits him from challenging any error on direct appeal. He instead challenges the instruction through an ineffective assistance of counsel claim, contending that his counsel's decision to agree to the instruction rendered his representation constitutionally deficient. While Montgomery acknowledges that ineffective assistance of counsel claims are generally not addressed on direct appeal, he argues that review in this instance would be appropriate because the trial record is sufficient to decide his claim. We disagree.

Our reasons for declining review of ineffectiveness claims on direct appeal are well established. To warrant relief, Montgomery must show that his counsel's actions were unreasonable and resulted in prejudice. The Supreme Court in *Massaro v. United States*, 538 U.S. 500, 505 (2003) reasoned that a trial record is "not developed precisely for the object" of addressing counsel's performance and is "thus often incomplete or inadequate" to assess an ineffectiveness claim. Additional fact-finding is required to ascertain whether a "seemingly unusual or misguided action" by counsel was strategic or otherwise justified. *Id*. Under collateral review, ineffectiveness claims are litigated before the trial court, which is the "forum best suited" for "determining the adequacy of representation during an entire trial." *Id*.

25

Montgomery argues no additional facts are needed to develop his ineffective assistance of counsel claim because this Court has already decided that a nearly identical instruction violated *Rosemond*. *Johnson*, 899 F.3d at 205. Reviewing for plain error, the *Johnson* Court held the violation did not justify relief because there was no reasonable probability that the instruction affected the trial's outcome. *Id*. Montgomery claims *Johnson*'s finding of error proves he was prejudiced by his counsel's failure to object to the accomplice liability instruction. But *Massaro* instructs that such a prejudice determination requires exploring whether trial counsel's performance *as a whole* was adequate and whether the contested action or inaction was reasonable. The record here is not sufficient to make such a determination. *See United States v. Olfano*, 503 F.3d 240, 246–47 (3d Cir. 2007) (concluding that, without a record addressing why counsel failed to ask for a continuance, this Court could not determine whether his representation was prejudicial). *See also United States v. McLaughlin*, 386 F.3d 547, 556 (3d Cir. 2004) (noting the "lack of a fully developed record often precludes a comprehensive inquiry" into counsel's alleged error). [15]

We abstain from reviewing Montgomery's claim at this stage to protect him from "having res judicata attach to the ineffective assistance claim" on an undeveloped record. *Virgin Islands v. Vanterpool*, 767 F.3d 157, 164 (3d Cir. 2014). We will deny the claim without prejudice to his right to raise the claim in a collateral proceeding.

## VI.

Montgomery challenges his convictions arising from the shooting of Patsy Crawford, who was shot at the same time her daughter Tina was murdered. He argues the evidence is

---

[15] We further note that the District Court never assessed the efficacy of counsel's performance at trial. Such an assessment could have made review of Montgomery's ineffectiveness claim on direct appeal "both feasible and efficient." *United States v. Washington*, 869 F.3d 193, 203 (3d Cir. 2017); *accord United States v. Jones*, 336 F.3d 245, 252–55 (3d Cir. 2003) (addressing ineffectiveness claim where District Court held a hearing to assess counsel's representation of defendant in entering guilty plea).

insufficient to prove that Patsy's shooting qualifies as witness tampering by attempted murder under 18 U.S.C. § 1512(a)(1)(C). Because the government introduced sufficient evidence to support the jury's finding that Montgomery attempted to kill Patsy Crawford to prevent her from communicating to law enforcement about her daughter's murder, we will affirm.[16]

The applicable standard for overturning a jury verdict for insufficient evidence presents a high hurdle for any appellant. "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Our precedent accordingly counsels us to sustain a jury verdict "as long as it does not fall below the threshold of bare rationality." *United States v. Caraballo-Rodriguez*, 726 F.3d 418, 431 (3d Cir. 2013) (internal quotes and citing authority omitted). It is the rare jury verdict that will fail to meet that "bare rationality" standard.

Section 1512(a)(1)(C) prohibits the killing or attempted killing of "another person" with the intention of preventing a "communication" to law enforcement of "information relating to the commission . . . of a Federal offense." Our precedent has delineated four elements the government must prove to sustain a conviction.

First, the defendant killed or attempted to kill another person. Second, the defendant was motivated by a desire to prevent the communication between any person and law enforcement authorities concerning the commission or possible commission of an offense. Third, that offense must be a federal offense. And fourth, a reasonable likelihood existed that the person whom the defendant believed may

---

[16] The government charged Montgomery with two counts of violating 18 U.S.C. § 1512(a)(1)(C). Count 7 charged that Montgomery killed Tina Crawford to prevent her from communicating with law enforcement about his drug dealing business. Count 9, meanwhile, charged that Montgomery attempted to kill Patsy Crawford (Tina's mother) to prevent her from communicating with law enforcement about Tina's murder. The jury convicted on both counts. Montgomery now challenges his conviction on Count 9.

communicate with law enforcement would in fact make a relevant communication to a federal law enforcement officer. *United States v. Tyler*, 956 F.3d 116, 123 (3d Cir. 2020).

As to the first element, we agree with the government that the record supports the jury's finding that Montgomery either attempted to kill Patsy Crawford or aided and abetted an attempt to kill her. The evidence established that Patsy was shot and lay in "critical condition" in the garage on the other side of the car from Tina. App. 1450, 1453. Considering the evidence establishing Montgomery's role in shooting Tina, the only reasonable inference from the record is that he or one of his accomplices shot Patsy as well. It was never established at trial where or how many times Patsy was shot, or whether she was directly targeted by the shooters. But the government introduced evidence that 24 shell casings were found at the scene of the shooting. Given the sheer number of bullets fired into the garage, a reasonable juror could have inferred the shooters intended to kill Patsy as well as Tina. *Jackson*, 443 U.S. at 324 (stating that sufficiency review of a challenged conviction requires reviewing the record in the light most favorable to the prosecution).

As to element two, the jury was required to conclude that Montgomery was motivated to attempt to kill Patsy by a desire to prevent her from communicating with law enforcement about the commission of a federal offense, i.e., Tina's murder. Resolving this question requires a brief foray into statutory interpretation. We begin, as we must, with the statutory text.

Section 1512(a)(1)(C) criminalizes "attempts to kill another person, with intent to prevent the communication by any person to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense." The statute plainly encompasses a broad range of those who may make such a communication: "[A]ny person." Likewise, the communication embraces a capacious subject matter: *Information relating to* the commission of a federal offense. Information is a broad term meaning "knowledge of a particular event or situation." *Information*, MERRIAM-WEBSTER DICTIONARY (11th ed. 2020). And "relating to" is a broad phrase, as well, that we interpret similarly to having "a connection with." *Pugin v. Garland*, 599 U.S. 600, 607 (2023).

28

So to violate the statute, a defendant must have an intent to prevent a communication by any person of information that relates to or has a connection with the commission of a federal offense.

The government offered sufficient circumstantial evidence for the jury to determine that Montgomery possessed the requisite intent. The government introduced evidence suggesting that Montgomery appeared at Patsy's home because he was on a venture to eliminate at least one federal witness. He knew that agents had raided Tina's home. He knew that Tina had lied to him when she denied telling agents anything that incriminated Montgomery. And he knew that Tina was heading to a meeting with her lawyer, and then with federal prosecutors, the day he killed her.[17] The government introduced evidence that Patsy was shot at least once and found in critical condition. The jury heard testimony from a witness that the gunmen quickly fled after the shooting. And the jury also had before it evidence that police officers arrived at the scene to investigate and that federal investigators became fully involved in the investigation after the murder.

Drawing all inferences in the government's favor, the jury reasonably found that Montgomery possessed the requisite intent to return a guilty verdict on Count 9. The jury was aware that Montgomery knew that Patsy was an eyewitness to his crime. She not only witnessed the shooting from beginning to end but was also one of its intended targets. Montgomery would have known that, as an eyewitness, Patsy could speak to such things as: The number of shooters; the physical features of the gunmen; and other details surrounding the ambush of her and her daughter. All such information would have related to the commission of a federal offense—Tina's murder. The

---

[17] Brown had a history of passing on to Montgomery information concerning Tina. Tina texted Brown that she was meeting with a lawyer, and Brown texted Montgomery 35 minutes before the shooting began. The jury could logically have inferred from Tina's text to Brown, coupled with Brown's history of passing on Tina's communications to Montgomery, that Brown informed Montgomery about Tina's upcoming meeting with a lawyer.

communication of that information falls within the statute's ambit.

And the jury could rightly infer that Montgomery would have known to a reasonable certainty that Patsy would speak to law enforcement unless he eliminated her as a witness. Any citizen should reasonably expect that police will soon arrive to investigate a shooting at which three to four assailants have opened fire at a home. And an investigation entails interviews of eyewitnesses. Moreover, the government introduced evidence that Montgomery and the other assailants quickly fled the scene, suggesting they knew police would soon arrive. Hence, the jury could infer Montgomery knew not only that Patsy had knowledge of details related to Tina's murder, but also that it was likely she would communicate those details to law enforcement.

Lastly, the jury would have known that Montgomery was on a mission to eliminate witnesses who were then likely to communicate information about his crimes. The jury could rely on common sense to draw the inference that Montgomery, in eliminating a witness to one federal crime—drug trafficking—would not at the same time choose to leave behind a new witness to an entirely new crime: The murder of a federal witness. A jury is always entitled to use common sense in drawing reasonable inferences. *United States v. Holmes*, 406 F.3d 337, 351 (5th Cir. 2005). Furthermore, our circuit's model jury instructions—which the District Court used in relevant part—task jurors with "decid[ing] what reasonable inferences, if any, [they]'ll draw based on all the evidence and [their] reason, experience, *and common sense*." Third Circuit Model Criminal Jury Instructions, Ch. 3 Final Instructions: General, Pt. 3.03 Direct and Circumstantial Evidence (emphasis added).

Taken together, these inferences support the jury's finding that Montgomery possessed the requisite intent to prevent Patsy from communicating with law enforcement.

The third element is whether the offense Montgomery sought to prevent Patsy from communicating about—here murdering a federal witness—"was actually a federal offense." *Tyler*, 956 F.3d at 123. No one has disputed that Tina's murder in violation of 18 U.S.C. § 1512(a)(1)(C) constituted a federal offense.

30

Finally, the government offered sufficient evidence to make out the fourth element: A "reasonable likelihood that the person whom the defendant believes will communicate with law enforcement," here Patsy, "would in fact make a relevant communication with a federal law enforcement officer." *Tyler*, 956 F.3d at 123. The government introduced evidence showing that Patsy's daughter Tina Crawford was a target of the investigation into Montgomery.[18] The government also introduced evidence showing that Tina was scheduled to meet with federal prosecutors to discuss a cooperation agreement the day of her murder. And the government offered evidence from which the jury could have inferred that Patsy witnessed Tina being shot. Together, this evidence sufficed to establish element four; federal law enforcement officers would of course speak to an eyewitness to the murder of a target of a federal investigation who was scheduled to meet with federal prosecutors.

Indeed, a government witness testified that, after Tina's murder, the Bureau of Alcohol, Tobacco, Firearms and Explosives "and all of its resources became involved in [the] investigation." Appx 1605–06. As final proof, an investigation into Tina's murder and Patsy's attempted murder did take place. "[T]he fact that a federal investigation ultimately occurred . . . is probative evidence of the likelihood that [witnesses] would have eventually communicated." *Bruce v. Warden Lewisburg USP*, 868 F.3d 170, 186 (3d Cir. 2017) (vacated on other grounds).

Because the government offered sufficient evidence for the jury to find all four elements of *Taylor*, we will affirm Montgomery's conviction under 18 U.S.C. § 1512(a)(1)(C) for the attempted murder of Patsy Crawford to prevent her from communicating to law enforcement about the murder of her daughter.

## VII.

Finally, we agree with Montgomery that the District Court committed plain error by imposing a mandatory consecutive 25-year sentence for Count 8, charging the use of a firearm to kill Tina Crawford in violation of 18 U.S.C. §

---

[18] Investigators intercepted several calls between Tina and Montgomery. They tracked the movement of Tina's car, and they searched her apartment.

924(j). The imposition of the consecutive sentence for a subsection 924(j) conviction was consistent with our then-controlling precedent in *United States v. Berrios*, 676 F.3d 118, 143 (3d Cir. 2012), but this decision was later overruled by the Supreme Court in *Lora v. United States*, 599 U.S. 453, 458 (2023) (holding that "[s]ubsection [924](j) contains no consecutive-sentence mandate").

Montgomery did not object to this sentence at the time that it was imposed, which means this claim is subject to plain error review. "Error is plain when it is clear or obvious and affects a defendant's substantial rights." *United States v. Diaz*, 90 F.4th 335, 348 (5th Cir. 2024) (citing *Olano*, 507 U.S. at 732–33 (1993)). The parties agree that imposing a mandatory consecutive term constituted a clear error, but the government contends Montgomery cannot establish the sentence impacted his substantial rights. We disagree.

Here, the 25-year term of imprisonment for his subsection 924(j) conviction was imposed to run consecutively to Montgomery's life sentence for the murder of Tina Crawford. An error affects a defendant's substantial rights if it affects "the outcome of the district court proceedings." *Olano*, 507 U.S. at 734. "Because we cannot say with complete confidence that the court would have imposed the same sentence" had the consecutive term not been deemed mandatory, "we must conclude that the error affected [Montgomery's] substantial rights." *United States v. Payano*, 930 F.3d 186, 198 (3d Cir. 2019) (internal quotations and citations omitted). That Montgomery was sentenced to a longer term of imprisonment than he would have been absent the error is enough to establish prejudice, despite his life sentence remaining intact. *Olano*, 507 U.S. at 734; *Diaz*, 90 F.4th at 348 (vacating sentence where district court did not exercise discretion under *Lora* and imposed three consecutive life sentences for subsection 924(j) convictions); *see also United States v. Ortiz-Orellana*, 90 F.4th 689, 705 (4th Cir. 2024) (vacating sentence where term of imprisonment for subsection 924(j) conviction was imposed consecutive to life sentence).

Before exercising our discretion to correct the error to Montgomery's sentence, we determine whether the error "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *Olano*, 507 U.S. at 736. Even though

the corrected sentence would not decrease the time Montgomery spends in prison, he is sentenced to a term of imprisonment longer than permitted by law. We recognize that "the public legitimacy of our justice system relies on procedures that are neutral, accurate, consistent, trustworthy, and fair, and that provide opportunities for error correction." *United States v. Henderson*, 64 F.4th 111, 121 (3d Cir. 2023) (quoting *Rosales-Mireles v. United States*, 585 U.S. 129, 141 (2018)) (internal quotation marks omitted). We will therefore provide the opportunity for error correction by vacating the sentence so that a sentence in accordance with the *Lora* decision may be imposed.

## VIII.

For the above reasons, we will affirm the convictions and judgments of sentence for James Perrin. For Price Montgomery, we will affirm the convictions and judgments of sentence except for the term of imprisonment imposed for violating 18 U.S.C. § 924(j) (Count 8), which we will vacate and remand for resentencing consistent with this opinion.